UNITED STATES *v.* ALBERTINI

No. 83–1624.   Argued April 15, 1985—Decided June 24, 1985

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 691.

*David A. Strauss* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Trott, Deputy Solicitor General Wallace, John F. De Pue,* and *Major Robert T. Lee.*

*Charles S. Sims* argued the cause for respondent. With him on the brief were *Burt Neuborne, William A. Harrison,* and *Yvonne Chotzen.*

JUSTICE O'CONNOR delivered the opinion of the Court.

The question presented is whether respondent may be convicted for violating 18 U. S. C. § 1382, which makes it unlawful to reenter a military base after having been barred by the commanding officer. Respondent attended an open house at a military base some nine years after the commanding officer ordered him not to reenter without written permission. The Court of Appeals for the Ninth Circuit held that respondent could not be convicted for violating § 1382 because he had a First Amendment right to enter the military base during the open house. 710 F. 2d 1410 (1983). We granted certiorari, 469 U. S. 1071 (1984), and we now reverse.

I

The events underlying this case date from 1972, when respondent and a companion entered Hickam Air Force Base (Hickam) in Hawaii ostensibly to present a letter to the commanding officer. Instead, they obtained access to secret Air Force documents and destroyed the documents by pouring animal blood on them. For these acts, respondent was convicted of conspiracy to injure Government property in violation of 18 U. S. C. §§ 371, 1361. Respondent also received a "bar letter" from the Commander of Hickam informing him that he was forbidden to "reenter the confines of this installation without the written permission of the Commander or an officer designated by him to issue a permit of reentry." App. 43; cf. *Greer* v. *Spock*, 424 U. S. 828, 838 (1976). The bar letter directed respondent to 18 U. S. C. § 1382 and quoted the statute, which provides:

> "Whoever, within the jurisdiction of the United States, goes upon any military, naval, or Coast Guard Reservation, post, fort, arsenal, yard, station, or installation, for any purpose prohibited by law or lawful regulation; or
>
> "Whoever reenters or is found within any such reservation, post, fort, arsenal, yard, station, or installa-

tion, after having been removed therefrom or ordered not to reenter by any officer in command or charge thereof—

"Shall be fined not more than $500 or imprisoned not more than six months, or both."

In subsequent years, respondent, according to his own testimony, received bar letters from a number of military bases in Hawaii. App. 30. In March 1981, he and eight companions improperly entered the Nuclear War Policy and Plans Office at Camp Smith in Hawaii and defaced Government property. *Ibid.* Respondent testified that he was not prosecuted for what he termed his "rather serious clear-cut case" of civil disobedience at Camp Smith, *ibid.*, and that the 1972 bar letter was the only one he had ever received for Hickam. *Id.*, at 28, 30.

Respondent entered Hickam again on May 16, 1981, during the base's annual open house for Armed Forces Day. On that day, members of the public, who ordinarily can enter Hickam only with permission, are allowed to enter portions of the base to view displays of aircraft and other military equipment and to enjoy entertainment provided by military and nonmilitary performers. Press releases issued by the base declared that "[w]hile Hickam is normally a closed base, the gates will be open to the public for this 32nd Annual Armed Forces Day Open House." *Id.*, at 45. Radio announcements similarly proclaimed that "the public is invited and it's all free." *Id.*, at 48.

With four friends, respondent attended the open house in order to engage in a peaceful demonstration criticizing the nuclear arms race. *Id.*, at 27–28. His companions gathered in front of a B–52 bomber display, unfurled a banner reading "Carnival of Death," and passed out leaflets. Respondent took photographs of the displays and did not disrupt the activities of the open house. The Commander of Hickam summoned Major Jones, the Chief of Security Police at the

base, and told him to have the individuals cease their demonstration. *Id.*, at 9. Before respondent was approached by military police, the Commander further informed Major Jones that he believed one of the individuals involved in the demonstration had been barred from Hickam. *Id.*, at 9–10, 13–14. Respondent and his companions were apprehended and escorted off the base.

An information filed on July 1, 1981, charged respondent with violating § 1382 because on May 16, 1981, he "unlawfully and knowingly" reentered Hickam Air Force Base "after [he] had previously been ordered not to reenter by an officer in command." *Id.*, at 3. Respondent was convicted after a bench trial and sentenced to three months' imprisonment. *Id.*, at 1. On appeal, respondent challenged his conviction on three grounds. 710 F. 2d, at 1413. First, he argued that he had written permission to reenter based on the advertisements inviting the public to attend the open house. Second, respondent contended that the 9-year-old bar letter was ineffective because it violated due process. Finally, he argued that his presence at Hickam during the open house was protected by the First Amendment. The Court of Appeals rejected respondent's first argument and found it unnecessary to consider the due process arguments. *Id.*, at 1413, 1417. The conviction must be reversed, the Court of Appeals held, because Hickam had been transformed into a temporary public forum during the open house, and the military could not exclude respondent from such a forum. *Id.*, at 1417.

## II

In the order granting certiorari, this Court asked the parties to address the additional question "[w]hether the respondent's attendance at the 'open house' at Hickam Air Force Base on May 16, 1981, was the kind of reentry that Congress intended to prohibit in 18 U. S. C. § 1382." 469 U. S., at 1071. Although this issue was not raised by the

parties or passed upon by the Court of Appeals, we address it to "'ascertain whether a construction of the statute is fairly possible by which the [constititutional] question may be avoided.'" *United States* v. *Grace,* 461 U. S. 171, 175–176 (1983), quoting *Crowell* v. *Benson,* 285 U. S. 22, 62 (1932).

Courts in applying criminal laws generally must follow the plain and unambiguous meaning of the statutory language. *Garcia* v. *United States,* 469 U. S. 70, 75 (1984); *United States* v. *Turkette,* 452 U. S. 576, 580 (1981). "[O]nly the most extraordinary showing of contrary intentions" in the legislative history will justify a departure from that language. *Garcia, supra,* at 75. This proposition is not altered simply because application of a statute is challenged on constitutional grounds. Statutes should be construed to avoid constitutional questions, but this interpretative canon is not a license for the judiciary to rewrite language enacted by the legislature. *Heckler* v. *Mathews,* 465 U. S. 728, 741–742 (1984). Any other conclusion, while purporting to be an exercise in judicial restraint, would trench upon the legislative powers vested in Congress by Art. I, §1, of the Constitution. *United States* v. *Locke,* 471 U. S. 84, 95–96 (1985). Proper respect for those powers implies that "[s]tatutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'N Fly* v. *Dollar Park and Fly, Inc.,* 469 U. S. 189, 194 (1985).

Turning to the statute involved here, we conclude that § 1382 applies to respondent's conduct. The relevant portion of the statute makes it unlawful for a person to reenter a military base after having been ordered not to do so by the commanding officer. Unless the statutory language is to be emptied of its ordinary meaning, respondent violated the terms of § 1382 when he reentered Hickam in 1981 contrary to the bar letter. Respondent, however, argues that § 1382 does not apply to his attendance at the open house for three

reasons. First, he contends that § 1382 does not allow indefinite exclusion from a military base, but instead applies only when a person has reentered "within a reasonable period of time after being ejected." Brief for Respondent 10. Second, respondent maintains that Congress did not intend § 1382 to apply when a military base is opened to the general public for purposes of attending an open house. Respondent finally argues that reentry is unlawful under § 1382 only if a person knows that his conduct violates an extant order not to return. None of these arguments is persuasive.

The legislative history of § 1382, although sparse, fully supports application of the statute to respondent. The statute was enacted in virtually its present form as part of a general revision and codification of the federal penal laws. Act of Mar. 4, 1909, ch. 321, § 45, 35 Stat. 1097. Both the War Department and the Department of Justice supported the statute as an extension of existing prohibitions on sabotage. The congressional Reports explained:

> "[I]t . . . is designed to punish persons who, having been ejected from a fort, reservation, etc., return for the purpose of obtaining information respecting the strength, etc., of the fort, etc., or for the purpose of inducing the men to visit saloons, dives, and similar places. Such persons may now go upon forts and reservations repeatedly for such purposes and there is no law to punish them." S. Rep. No. 10, 60th Cong., 1st Sess., pt. 1, p. 16 (1908); H. R. Rep. No. 2, 60th Cong., 1st Sess., pt. 1, p. 16 (1908).

The congressional Reports, as well as the floor debates, 42 Cong. Rec. 689 (1908) (remarks of Reps. Moon and Williams), indicate that the primary purpose of § 1382 was to punish spies and panderers for repeated entry into military installations. Nonetheless, § 1382 by its terms is not limited to such persons, and such a restrictive reading of the statute would frustrate its more general purpose of "protect[ing] the prop-

erty of the Government so far as it relates to the national defense." 42 Cong. Rec. 689 (1908) (remarks of Reps. Moon and Payne). One need hardly strain to conclude that this purpose is furthered by applying § 1382 to respondent, who has repeatedly entered military installations unlawfully and engaged in vandalism against Government property.

We find no merit to the reasons respondent offers for concluding he did not violate § 1382. First, nothing in the statute or its history supports the assertion that § 1382 applies only to reentry that occurs within some "reasonable" period of time. Respondent argues that most prosecutions for violating the second paragraph of § 1382 have involved reentry within a year after issuance of a bar order, and further asserts that recent bar letters for Hickam have been limited to a 1- or 2-year period. We agree that prosecution under § 1382 would be impermissible if based on an invalid bar order. But even assuming the accuracy of respondent's description of prosecutorial and military policy, we do not believe that it justifies engrafting onto § 1382 a judicially defined time limit. Although due process or military regulations might limit the effective lifetime of a bar order, § 1382 by its own terms does not limit the period for which a commanding officer may exclude a civilian from a military installation.

Section 1382, we further conclude, applies during an open house. Of course, Congress in 1909 very likely gave little thought to open houses on military bases. The pertinent question, however, is whether § 1382 applies to a base that is open to the general public. The language of the statute does not limit § 1382 to military bases where access is restricted. Moreover, the legislative intent to punish panderers and others who repeatedly enter military facilities suggests that Congress was concerned with bases that are to some extent open to nonmilitary personnel. Finally, limiting the prohibition on reentry to closed military bases would make the second paragraph of § 1382 almost superfluous, because the

first paragraph of the statute already makes it unlawful for a person to go upon a military installation "for any purpose prohibited by law or lawful regulation." 18 U. S. C. § 1382. Cf. *Heckler* v. *Chaney,* 470 U. S. 821, 829 (1985) (noting common-sense principle that a statute is to be read to give effect to each of its clauses).

The final statutory argument advanced by respondent is that he did not violate § 1382 because he did not subjectively believe that his attendance at the open house was contrary to a valid order barring reentry. This argument misperceives the knowledge required for a violation of the statute. Cf. *United States* v. *Parrilla Bonilla,* 648 F. 2d 1373, 1377 (CA1 1981) (specific intent to violate particular regulation not required for violation of first paragraph of § 1382). The second paragraph of § 1382 does not contain the word "knowingly" or otherwise refer to the defendant's state of mind, and there is no requirement that the Government prove improper motive or intent. *Holdridge* v. *United States,* 282 F. 2d 302, 310–311 (CA8 1960). Respondent does not dispute that he received the bar letter in 1972 and deliberately and knowingly reentered the base to which the letter applied. Nothing in the language of § 1382 or in previous judicial decisions supports the rather remarkable proposition that merely because respondent thought the bar order was no longer effective, he was thereby immunized from prosecution. Cf. *United States* v. *International Minerals & Chemical Corp.,* 402 U. S. 558, 563 (1971).

We also reject the suggestion, made in the dissenting opinion, that § 1382 does not apply because the circumstances did not reasonably indicate to respondent that his reentry during the open house was prohibited. *Post,* at 696–697, 701. The assertion that respondent lacked notice that his entry was prohibited is implausible. The bar letter in no way indicated that it applied only when public access to Hickam was restricted. Any uncertainty respondent had in this regard might have been eliminated had he sought, in

accord with the bar letter, permission to reenter from the base commander. There is no contention that respondent ever asked to have the bar letter rescinded or otherwise requested permission to reenter the base. Moreover, the dissenting opinion exaggerates the implications of our holding. We have no occasion to decide in what circumstances, if any, § 1382 can be applied where anyone other than the base commander has validly ordered a person not to reenter a military base. Nor do we decide or suggest that the statute can apply where a person unknowingly or unwillingly reenters a military installation. Finally, we note that respondent has not disputed that he entered a portion of Hickam that was a "military reservation, army post, fort, or arsenal" within the meaning of § 1382.

## III

The Court of Appeals held that the First Amendment bars respondent's conviction for violating § 1382. A military base, the court acknowledged, is ordinarily not a public forum for First Amendment purposes even if it is open to the public. See *Greer* v. *Spock,* 424 U. S. 828 (1976). Nonetheless, the court relied on *Flower* v. *United States,* 407 U. S. 197 (1972) *(per curiam),* to conclude that portions of Hickam constituted at least a temporary public forum because the military had opened those areas to the public for purposes related to expression. 710 F. 2d, at 1414–1417. Having found that the public had a First Amendment right to hold signs and to distribute leaflets at Hickam on Armed Forces Day, the Court of Appeals then considered whether the military could rely on the bar letter to exclude respondent from the base. *Id.,* at 1417. The court, again relying on *Flower,* held that the military lacks power to exclude persons from a military base that has become a public forum. 710 F. 2d, at 1417.

In holding that § 1382 cannot be applied during an open house, the Court of Appeals misapprehended the significance of *Flower.* As this Court later observed in *Greer,* the decision in *Flower* must be viewed as an application of estab-

lished First Amendment doctrine concerning expressive activity that takes place in a municipality's open streets, sidewalks, and parks. 424 U. S., at 835–836. *Flower* did not adopt any novel First Amendment principles relating to military bases, but instead concluded that the area in question was appropriately considered a public street. There is "no generalized constitutional right to make political speeches or distribute leaflets," *id.*, at 838, on military bases, even if they are generally open to the public. *Id.*, at 830, 838, and n. 10. *Greer* clarified that the significance of the *per curiam* opinion in *Flower* is limited by the unusual facts underlying the earlier decision. 424 U. S., at 837.

The Court in *Flower* summarily reversed a conviction under § 1382 of a civilian who entered a military reservation after receiving a bar letter. At the time of his arrest, the civilian was "quietly distributing leaflets on New Braunfels Avenue at a point within the limits of Fort Sam Houston" in San Antonio, Texas. 407 U. S., at 197. No sentry was posted anywhere along the street, which was open to unrestricted civilian traffic 24 hours a day. *Id.*, at 198. The Court determined that New Braunfels Avenue was a public thoroughfare no different than other streets in the city, and that the military had abandoned not only the right to exclude civilian traffic from the avenue, but also any right to exclude leafleteers. *Greer* v. *Spock, supra,* at 835. The defendant in *Flower* received a bar letter because he participated in an attempt to distribute unauthorized publications on the open military base. 407 U. S., at 197; *United States* v. *Flower,* 452 F. 2d 80, 82, 87 (CA5 1971). This was the very activity that *Flower* held protected by the First Amendment.

*Flower* cannot plausibly be read to hold that regardless of the events leading to issuance of a bar letter, a person may not subsequently be excluded from a military facility that is temporarily open to the public. Instead, *Flower* establishes that where a portion of a military base constitutes a public forum because the military has abandoned any right to ex-

clude civilian traffic and any claim of special interest in regulating expression, see *Greer* v. *Spock, supra,* at 836–838, a person may not be excluded from that area on the basis of activity that is itself protected by the First Amendment. Properly construed, *Flower* is simply inapplicable to this case. There is no suggestion that respondent's acts of vandalism in 1972, which resulted in the issuance of the bar letter, were activities protected by the First Amendment. The observation made by the Court of Appeals, 710 F. 2d, at 1417, that enforcement of the bar letter was precipitated by respondent's "peaceful expressive activity" misses the point. Respondent was prosecuted not for demonstrating at the open house, but for reentering the base after he had been ordered not to do so.

Respondent argues that because Hickam was temporarily transformed into a public forum, the exercise of standardless discretion by the base commander to exclude him from the base violates the First Amendment. Cf. *Shuttlesworth* v. *Birmingham,* 394 U. S. 147, 150–151 (1969). The conclusion of the Court of Appeals that Hickam was ever a public forum is dubious. Military bases generally are not public fora, and *Greer* expressly rejected the suggestion that "whenever members of the public are permitted freely to visit a place owned or operated by the Government, then that place becomes a 'public forum' for purposes of the First Amendment." 424 U. S., at 836. See also *United States* v. *Grace,* 461 U. S., at 177. Nor did Hickam become a public forum merely because the base was used to communicate ideas or information during the open house. *United States Postal Service* v. *Greenburgh Civic Assns.,* 453 U. S. 114, 130, n. 6 (1981). The District Court did not make express findings on the nature of public access to Hickam during the open house, and the record does not suggest that the military so completely abandoned control that the base became indistinguishable from a public street as in *Flower.*

Whether or not Hickam constituted a public forum on the day of the open house, the exclusion of respondent did not violate the First Amendment. Respondent concedes that the commander of Hickam could exclude him from the closed base, but contends this power was extinguished when the public was invited to enter on Armed Forces Day. We do not agree that "the historically unquestioned power of a commanding officer to exclude civilians from the area of his command," *Cafeteria Workers* v. *McElroy*, 367 U. S. 886, 893 (1961), should be analyzed in the same manner as government regulation of a traditional public forum simply because an open house was held at Hickam. See *Greer* v. *Spock,* 424 U. S., at 838, n. 10 (fact that speakers previously allowed on base "did not leave the authorities powerless thereafter to prevent any civilian from entering . . . to speak on any subject whatever"). The fact that respondent had previously received a valid bar letter distinguished him from the general public and provided a reasonable grounds for excluding him from the base. That justification did not become less weighty when other persons were allowed to enter. Indeed, given the large number of people present during an open house, the need to preserve security by excluding those who have previously received bar letters could become even more important, because the military may be unable to monitor closely who comes and goes. Where a bar letter is issued on valid grounds, a person may not claim immunity from its prohibition on entry merely because the military has temporarily opened a military facility to the public.

Section 1382 is content-neutral and serves a significant Government interest by barring entry to a military base by persons whose previous conduct demonstrates that they are a threat to security. Application of a facially neutral regulation that incidentally burdens speech satisfies the First Amendment if it "furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental

restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States* v. *O'Brien,* 391 U. S. 367, 377 (1968). Respondent argues that even if *O'Brien* applies here, the general exclusion of recipients of bar letters from military open houses fails under the First Amendment because it is greater than is essential to the furtherance of Government interests in the security of military installations.

Respondent maintains that enforcing bar letters is not essential to security because reported cases concerning § 1382 have not involved vandalism or other misconduct during open houses. Moreover, respondent asserts that persons holding bar letters have been allowed to attend open houses on bases other than Hickam. Finally, respondent contends that the Government interests were adequately served by the security measures taken during the open house and by statutes that punish any misconduct occurring at such events. Cf. 710 F. 2d, at 1417 (noting that "sensitive areas of Hickam were cordoned off and protected by guards"). Respondent's arguments in this regard misapprehend the third element of the *O'Brien* standard. We acknowledge that barring respondent from Hickam was not "essential" in any absolute sense to security at the military base. The military presumably could have provided him with a military police chaperone during the open house. This observation, however, provides an answer to the wrong question by focusing on whether there were conceivable alternatives to enforcing the bar letter in this case.

The First Amendment does not bar application of a neutral regulation that incidentally burdens speech merely because a party contends that allowing an exception in the particular case will not threaten important government interests. See *Clark* v. *Community for Creative Non-Violence,* 468 U. S. 288, 296–297 (1984) ("the validity of this regulation need not be judged solely by reference to the demonstration at hand"). Regulations that burden speech incidentally or control the

time, place, and manner of expression, see *id.*, at 298–299, and n. 8, must be evaluated in terms of their general effect. Nor are such regulations invalid simply because there is some imaginable alternative that might be less burdensome on speech. *Id.*, at 299. Instead, an incidental burden on speech is no greater than is essential, and therefore is permissible under *O'Brien,* so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation. Cf. 468 U. S., at 297 ("if the parks would be more exposed to harm without the sleeping prohibition than with it, the ban is safe from invalidation under the First Amendment"). The validity of such regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests. *Id.*, at 299.

We are persuaded that exclusion of holders of bar letters during military open houses will promote an important Government interest in assuring the security of military installations. Nothing in the First Amendment requires military commanders to wait until persons subject to a valid bar order have entered a military base to see if they will conduct themselves properly during an open house. Cf. *Perry Ed. Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 52, and n. 12 (1983). In *Community for Creative Non-Violence,* we observed that *O'Brien* does not "assign to the judiciary the authority to replace the Park Service as the manager of the Nation's parks or endow the judiciary with the competence to judge how much protection of park lands is wise and how that level of conservation is to be attained." 468 U. S., at 299 (footnote omitted). We are even less disposed to conclude that *O'Brien* assigns to the judiciary the authority to manage military facilities throughout the Nation.

As a final First Amendment challenge to his conviction, respondent asserts that the Government apprehended and prosecuted him because it opposed the demonstration against

nuclear war. This argument lacks evidentiary support. The demonstration did attract the attention of military officials to respondent and his companions, and the base Commander ordered military police to stop them from displaying their banner and distributing leaflets. Nonetheless, Major Jones testified that respondent was not approached or apprehended until he was identified as the possible holder of a bar letter. App. 9–11, 13–14. The trial judge found that this testimony was accurate, Tr. 98, and we see no reason to disturb that finding on appeal. Inasmuch as respondent contends that his prosecution was impermissibly motivated, he did not raise below and the record does not support a claim that he was selectively prosecuted for engaging in activities protected by the First Amendment. Cf. *Wayte* v. *United States*, 470 U. S. 598, 608–610 (1985).

IV

Before the District Court and the Court of Appeals, respondent argued that his prosecution based on the 1972 bar letter violated due process. Respondent has made similar arguments to this Court. Brief for Respondent 19, 20, 26–27, n. 38. Although a commanding officer has broad discretion to exclude civilians from a military base, this power cannot be exercised in a manner that is patently arbitrary or discriminatory. *Cafeteria Workers* v. *McElroy*, 367 U. S., at 898. Respondent, however, has not shown that the 1972 bar letter is inconsistent with any statutory or regulatory limits on the power of military officials to exclude civilians from military bases. Nor do we think that it is inherently unreasonable for a commanding officer to issue a bar order of indefinite duration requiring a civilian to obtain written permission before reentering a military base. The Court of Appeals did not address whether, on the facts of this case, application of the 1972 bar letter to respondent was so patently arbitrary as to violate due process, and we therefore do not decide that issue.

For the reasons stated, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

In 1909 Congress enacted a new statute making it a federal crime to trespass on military bases in specified circumstances. That statute, now codified as 18 U. S. C. § 1382, provided:

"Whoever shall go upon any military reservation, army post, fort, or arsenal, for any purpose prohibited by law or military regulation made in pursuance of law, or whoever shall reenter or be found within any such reservation, post, fort, or arsenal, after having been removed therefrom or ordered not to reenter by any officer or person in command or charge thereof, shall be fined not more than five hundred dollars, or imprisoned not more than six months, or both." 35 Stat. 1097.

In my opinion, Congress did not intend to punish a visit to a military reservation under the second clause of this statute when circumstances reasonably indicated that the visit was not prohibited but welcome.

In this case, respondent was "removed as a trespasser from Hickam Air Force Base," on March 2, 1972, and "ordered not to reenter."[1] The removal and order not to

---

[1] In addition to his removal from the base, respondent received a two-paragraph form letter. The first paragraph reads as follows:

"You are being removed as a trespasser from Hickam Air Force Base, a military reservation, and ordered not to reenter the confines of this installation without the written permission of the Commander or an officer designated by him to issue a permit of reentry." App. 43.

The second paragraph of the letter calls the addressee's attention to 18 U. S. C. § 1382, which is quoted in full.

return apparently were the result of respondent's destruction of Government property valued under $100 during a demonstration against the war in Vietnam.[2]

Over nine years later, respondent was "found within . . . such reservation." Among 50,000 other civilians, he had accepted a widely advertised invitation to the public to attend the 32nd Annual Armed Forces Day Open House hosted by Hickam Air Force Base on May 16, 1981. A news release, issued by the Base, stated:

"HICKAM HOSTS JOINT SERVICE OPEN HOUSE

"Hickam Air Force Base, Hawaii (April 16, 1981)— The 32nd Annual Armed Forces Day Open House will be held here Saturday May 16 from 9 a. m. to 4 p. m. The

---

[2] During the bench trial, when the prosecution offered to prove respondent's 1972 offense, the following colloquy occurred:

"THE COURT: Well, it really doesn't make any difference what he was arrested for or what he was convicted of. He was issued a bar letter, right?

"MR. STARLING [for the United States]: Yes.

"THE COURT: He could have been issued a bar letter for chewing gum in the wrong place.

"MR. STARLING: Your Honor, I perceive that on the record it's not going to be clear as to who exactly got the bar letter.

"THE COURT: Go ahead.

"[MR. STARLING:] Okay. [W]hat was the outcome of the case involving—

"THE COURT: If you know.

"[MR. STARLING:] —The incident on March 2nd, 1972?

"[MR. SHISHIDO, FBI SPECIAL AGENT:] Following the incident on March 2nd, . . .

"[MR. STARLING:] Yes.

"[THE WITNESS:] Well, James Albertini along with two others were brought to trial in federal district court and convicted of—

"MR. TRECKER [for the defendant]: Your Honor, we would object on the grounds that this—the witness is obviously testifying from hearsay at this point.

"THE COURT: I'll take judicial notice of the fact that I tried the case and they were convicted of misdemeanors, weren't they?

"THE WITNESS: Yes.

"THE COURT: Yes. Value under a hundred dollars." App. 7.

theme this year is the 'U. S. Armed Forces—Strong and Ready.'

"Top local, country and western, and military entertainment—provided by the Royal Hawaiian Band, the Aloha Airlines Musical/Hula Troupe, J. T. and the Rowdy Band, Dave West and the Chaingang, Chris Cassidy and the Rainbow Connection, the Skylarks and the Fleet Marine Force Pacific Band—will perform during the open house.

"More than 30 aircraft from the U. S. Army, Navy, Air Force, Marine Corps, Coast Guard, Hawaii Army and Air National Guard, Civil Air Patrol and the Wheeler Aero Club will be on display throughout the day.

"Parachute jumps by the Navy and the Marine Corps, Marine troops, rappelling from helicopters, aircraft fly-overs by the Hawaii Air National Guard, Air Force and the Navy are also scheduled.

"Additionally, a crash/rescue demonstration by the Hickam Fire Department, a helicopter rescue demonstration by the Coast Guard and several police dog demonstrations by the Hickam Security Police will be conducted that day.

"Also open that day is the annual Air Force Hawaii Youth Festival. Carnival rides, games and a midway packed with food and drinks will be the main attractions. Air Force nominees, representing the various commands at Hickam will compete for the crown of Youth Festival Queen. The crowning ceremony will take place Friday evening at 6 p. m.

"Hickam, normally a closed base, will be open to the public for the Armed Forces Day Open House." App. 46–47.

Radio advertisements extended a similar invitation to the public to attend the open house. *Id.*, at 48.

In my opinion, respondent's visit to the open house in this case in response to a general invitation to the public extended

nine years after he was removed from the base and ordered not to reenter does not involve the kind of reentry that Congress intended to prohibit when it enacted the 1909 statute. In reaching a contrary conclusion, the Court relies heavily on the ordinary meaning of the statutory language, the fact that respondent had committed a misdemeanor on the base in 1972, and the fact that respondent's removal in 1972 was evidenced by a "bar letter." The "plain language" argument proves too much, and the evidentiary arguments prove too little.

I

In *Cafeteria Workers* v. *McElroy*, 367 U. S. 886 (1961), this Court recognized "the historically unquestioned power of a commanding officer summarily to exclude civilians from the area of his command." *Id.*, at 893. In exercising this power, a base commander is only limited by the Constitution and by the standard administrative requirement that "he must not act in an arbitrary or capricious manner. His action must be reasonable in relation to his responsibility to protect and preserve order on the installation and to safeguard persons and property thereon."[3] Even with these limitations, civilians may be removed from military bases for a wide variety of reasons such as reconnoitering military fortifications or troop movements, carrying a concealed weapon or a controlled substance, destroying Government property, creating a disturbance, violating a traffic regulation, attempting to induce a soldier to visit a saloon or to engage in an immoral act, wandering into an area where a training exercise is in progress, or perhaps even "chewing gum in the wrong place." See n. 2, *supra.*[4]

---

[3] U. S. Air Force Reg. No. 355–11, ¶ 1(b) (Sept. 10, 1971). See also U. S. Dept. of Defense Directive No. 5200.8, ¶ C (July 29, 1980); *Cafeteria Workers* v. *McElroy*, 367 U. S., at 898.

[4] The record in *Greer* v. *Spock*, 424 U. S. 828 (1976), indicated that bar orders "have been issued for offenses such as possession of marijuana or narcotics, assault, possession of stolen property, solicitation for prostitu-

Congress enacted § 1382 as a supplement to the military's power to exclude unwelcome civilians from military installations. The Senate and House Committee Reports on the bill explain the reasons for enacting § 1382:

"It is . . . designed to punish persons who, having been ejected from a fort, reservation, etc., return for the purpose of obtaining information respecting the strength, etc., of the fort, etc., or for the purpose of inducing the men to visit saloons, dives, and similar places. Such persons may now go upon forts and reservations repeatedly for such purposes and there is no law to punish them." S. Rep. No. 10, 60th Cong., 1st Sess., 16 (1908); H. R. Rep. No. 2, 60th Cong., 1st Sess., 16 (1908).[5]

Section 1382 provides for criminal punishment, in addition to administrative ejectment, for a limited class of unwelcome visitors to military installations.

---

tion, carrying concealed weapons, traffic offenses, contributing to the deliquency of a minor, impersonating a female, fraud, and unauthorized use of an ID card." *Spock* v. *David*, 469 F. 2d 1047, 1055 (CA3 1972).

[5] The purpose of the section was outlined in the House debates on the bill:

"Mr. WILLIAMS. . . . [T]he object of this law is to keep out spies, and to keep out people who want to draw maps of forts and arsenals and who want to find out the sort of powder we are compounding. The object is to protect the military secrets of the Government from those in whose possession they might do harm . . . .

.          .          .          .

"Mr. MOON[.] The object of this section has been clearly expressed by [Mr. Williams]. It was urged . . . by the War Department, not only for the purposes enumerated there, but to protect soldiers from people coming onto the reservation and taking them off to dives and illicit places surrounding the encampments. It was said to be a frequent occurrence that people would come with carriages and conveyances and time after time lure the soldiers away. They could be ordered away, but there was no law to punish them for reentering and constantly returning, and therefore they constantly defied authority by reappearing upon the reservation." 42 Cong. Rec. 689 (1908).

See also *id.*, at 589.

The power to initiate criminal proceedings under § 1382 is narrower than the base commander's broad power to exclude civilians from his facility. By its terms, the first clause of the statute only applies to persons who seek entry to a military installation for the purpose of committing unlawful acts. The second applies to any person who reenters the facility after physical removal or an order not to reenter. The limited criminal liability provided by Congress in § 1382 evinces a design to protect innocent or inadvertent entries onto military lands from becoming a criminal trespass.[6]

The two clauses of § 1382 were originally enacted as a single sentence; if they are read together, a plausible construction becomes apparent. The statute was aimed at trespassers— civilians whom the military had the power to exclude but not to punish. The first clause authorized the punishment of a trespasser if it could be proved that he had entered "for any purpose prohibited by law or [lawful] military regulation"; the second clause made it unnecessary to prove any unlawful purpose if the trespasser "reenter[s]" after having been removed. In many circumstances, of course, a second trespass in defiance of removal or an order not to reenter may safely be presumed to be motivated by an unlawful purpose—especially when the reentry closely follows the exclusion from the base, and its circumstances are similar.

When circumstances reasonably indicate to an individual that a visit to the base is permitted or even welcome, there is no "reentry" in defiance of authority as the statute here

---

[6] The comment following the Model Penal Code section defining criminal trespass suggests that this design is a familiar one: "The common thread running through [statutes defining criminal trespass] is the element of unwanted intrusion, usually coupled with some sort of notice to would-be intruders that they may not enter." American Law Institute, Model Penal Code § 221.2, Comment 1 (1980). The Code requires that a criminal trespasser know "that he is not licensed or privileged" to enter the property. §§ 221.2(1), (2). It also provides an affirmative defense to any intruder who "reasonably believed that the owner of the premises . . . would have licensed him to enter or remain." § 221.2(3)(c).

presumes. Base authorities, of course, have ample power to exclude such individuals. But criminal prosecution of a person entering under these circumstances is fundamentally inconsistent with Congress' intent to excuse innocent and inadvertent intrusions onto military reservations. No rule of construction requires that we attribute to Congress an intent which is at odds with its own design and which results "in patently absurd consequences." *United States* v. *Brown,* 333 U. S. 18, 27 (1948). In fact, this Court, "in keeping with the common-law tradition and with the general injunction that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity,' *Rewis* v. *United States,* 401 U. S. 808, 812 (1971), has on a number of occasions read a state-of-mind component into an offense even when the statutory definition did not in terms so provide." *United States* v. *United States Gypsum Co.,* 438 U. S. 422, 437 (1978).

## II

Adopting a starkly literal interpretation of the second clause of § 1382, the Court concludes that Congress intended to impose strict liability every time an individual is "found within" a military reservation after having been "removed therefrom or ordered not to reenter." Under this construction, the circumstances of neither the removal nor the reentry are relevant to the criminal offense. Emphasizing the absence of any reference to the defendant's state of mind in the second clause, the Court rejects what it considers to be the "remarkable proposition" that a civilian removed from a base or ordered not to reenter may ever reasonably believe that he could safely return to the base. *Ante,* at 683. The Court's literal approach to the question of statutory construction, if applied with the frozen logic the Court purports to espouse, expands the coverage of the Act far beyond anything that Congress actually could have intended.

There are many situations in which the circumstances of the removal or order not to reenter simply do not suggest to

the reasonable citizen that a later reentry is barred. Under the Court's interpretation of the statute, a person who was removed from Hickam in 1972 because he was intoxicated, is guilty of a federal offense if he returns to attend an open house nine years later. Even worse, it is not inconceivable that at the 4 p. m. curfew hour many persons may not yet have departed the Hickam open house. If the base commander, or someone acting under his authority, terminated the party with an address over the loudspeaker system which ended with an unambiguous order to depart within the next 30 minutes, hundreds—perhaps thousands—of civilians would have "been removed therefrom" within the literal meaning of § 1382. If the statutory language is interpreted literally, every one of these civilians would act at his peril if he accepted an invitation to the open house in the following year.[7]

Moreover, highways or other public easements often bisect military reservations. Cf. *Flower* v. *United States,* 407 U. S. 197 (1972). Respondent has informed us that a substantial portion of the main runway at Honolulu International Airport lies inside the boundaries of Hickam Air Force Base. Brief for Respondent 8. If an individual who has been removed from Hickam is liable under § 1382 whenever he is thereafter "found within" its boundaries, he risks criminal punishment every time he departs on an airline flight that may use the runway traversing the base. The use of these military lands for the limited public purposes for which they

---

[7] In response to this dissent, the Court has added a new paragraph disclaiming any suggestion that the statute would be applied literally "where anyone other than the base commander" issued the order not to reenter, or "where a person unknowingly or unwillingly reenters a military installation," *ante,* at 684. Having thus disclaimed the stark implications of its literal interpretation of the statute, the Court appears to rely instead on its own finding of fact that respondent must have known that his reentry was prohibited. I wonder if the Court would make the same finding if, instead of accepting an invitation to an open house, respondent had accepted an invitation to enlist in the Air Force.

have been set aside does not involve the bold defiance of authority that is foreseen by the structure of the statute and reflected in its legislative history. Surely Congress did not intend to impose criminal liability for the use of a civilian airport—even for persons who have been previously "removed" from a military base by administrative action, or ordered not to reenter.

The Court prefers to rely on the Due Process Clause to limit the oppressive and absurd consequences of its literal construction. It seems wiser to presume that "the legislature intended exceptions to its language which would avoid results of this character. The reason of the law in such cases should prevail over its letter." *United States* v. *Kirby*, 7 Wall. 482, 486–487 (1869). At some point, common sense must temper the excesses of statutory literalism.

## III

The Court repeatedly emphasizes that respondent received a "bar letter" ordering him not to reenter the base. The statute, however, contains no requirement that the removal of a trespasser be documented in any way or that an order not to reenter be in writing. In 1909 Congress was concerned with trespassers who refused to obey verbal orders to depart. See n. 5, *supra*. The practice of issuing written orders not to reenter apparently arose after the enactment of the statute in order to serve an evidentiary function.

The bar letter is evidence of the fact that its recipient has been removed from the base and ordered not to reenter. It is issued when prosecution for subsequent reentry is contemplated,[8] but nothing in the statute gives such a letter any

---

[8] Paragraph 3(b) of U. S. Air Force Reg. 355–11 (Sept. 10, 1971) provides:

"Removal of Violators. If unauthorized entry occurs, the violators may be apprehended, ordered to leave, and escorted off the installation by personnel carefully selected for such duties. The complete and proper identification of visitors, including the taking of photographs, must be

greater legal effect than a sentry's ejectment of a peddler or a panderer. As a matter of administration, the practice of issuing such bar letters is surely commendable, but it cannot, in my judgment, expand the coverage of the statute in the slightest.

The Court also seems to attach significance to the fact that the bar letter delivered to respondent in 1972 had been precipitated by an unlawful act. I agree, of course, that Congress could not have intended the statute to apply to a reentry following an invalid order of removal—even if the literal wording of the Act draws no such distinction. But a verbal order to depart simply because the curfew hour has been reached has the same legal effect as an order to depart because a crime has been committed. In either event, a reentry will violate § 1382.

In this case, the evidentiary significance of the 1972 removal and order not to reenter is significantly attenuated by the passage of nearly a decade from the date of the event. Every area of our laws recognizes that at some point, "even wrongdoers are entitled to assume that their sins may be forgotten." *Wilson* v. *Garcia*, 471 U. S. 261, 271 (1985). By limiting the effect of orders not to reenter to a period of one or two years, App. 60–62, recent military practice has recognized that the character of an individual may change dramatically over time. Cf. Fed. Rule Evid. 609(b). Indeed, until this case no reported prosecution under § 1382 relied on a removal or order not to reenter of greater vintage.[9]

---

accomplished. Violators who reenter an installation—after having been removed from it or having been ordered, by an officer or person in command or charge, not to reenter—may be prosecuted under 18 U. S. C. 1382. If prosecution for subsequent reentry is contemplated, the order not to reenter should be in writing (Attachment #1), so as to be easily susceptible of proof. Commanders are cautioned that only civil law enforcement authorities have the power to arrest and prosecute for unauthorized entry of Government property."

[9] *Flower* v. *United States*, 407 U. S. 197 (1972) (reentry 1½ months after order barring reentry); *United States* v. *Quilty*, 741 F. 2d 1031 (CA7 1984)

A decade-old bar letter might provide a basis for excluding the recipient from a base under appropriate circumstances. It does not, however, provide persuasive evidence that a reasonable person would believe that its proscriptive effect continued in perpetuity to pre-empt the effect of a public invitation to attend an open house at the base.[10] This is especially so when the original order was issued for a relatively minor transgression completely unrelated to the circumstances of the later intrusion.

The refrain in the Court's opinion concerning bar letters that the respondent may have received from other military bases in Hawaii is baffling considering its holding that the reasonableness of the later intrusion is irrelevant. The Court's reliance on these bar letters is especially puzzling since they are not contained in the record and may well have been invalid.[11] In any case, the fact that respondent's opposition to military preparedness may have caused other base commanders to deliver bar letters to him is quite irrelevant to the question whether circumstances reasonably indicated

---

(1½ months); *United States* v. *May*, 622 F. 2d 1000 (CA9) (176 defendants, 1 day; 5 defendants, 10½ months), cert. denied *sub nom. Phipps* v. *United States*, 449 U. S. 984 (1980); *United States* v. *Douglass*, 579 F. 2d 545 (CA9 1978) (16 days after bar letter, 1 day after verbal order not to reenter); *Government of Canal Zone* v. *Brooks*, 427 F. 2d 346 (CA5 1970) (conviction affirmed 17 months after order issued); *United States* v. *Jelinski*, 411 F. 2d 476 (CA5 1969) (reentry 7½ months after order); *Weissman* v. *United States*, 387 F. 2d 271 (CA10 1967) (2 days); *Holdridge* v. *United States*, 282 F. 2d 302 (CA8 1960) (Blackmun, J., for the court) (same day).

[10] Cf. *United States* v. *Gourley*, 502 F. 2d 785, 788 (CA10 1973) (order not to reenter held invalid where issued for expressive activity at football game held in stadium on Air Force Academy grounds, in part, because "spectators are actively encouraged to attend the games, and do so in large numbers with no restrictions whatever at the gates").

[11] At oral argument, the Government conceded that a bar order would be invalid if it had been issued in response to activity protected by the First Amendment. Tr. of Oral Arg. 13–14, 21. The order involved in *Flower* v. *United States*, 407 U. S. 197 (1972), is an example of such an order. See also n. 10, *supra*.

to him that his attendance at the Hickam open house was prohibited. At most, these unrelated incidents might have supported the removal of respondent from Hickam if he sought to enter, or perhaps the issuance of a fresh order barring reentry there.[12]

The Court seems to regard "the effective lifetime of a bar order" as the critical issue. It concedes that the Constitution or military regulation may constrain a commanding officer's power to exclude a civilian from a military installation, and correctly observes that § 1382 does not place any limit on that power. *Ante*, at 682. What the Court overlooks is the distinction between the commander's power to exclude— which is very broad indeed—and the sovereign's power to punish which may not extend one inch beyond the authority conferred by Congress.[13]

In my opinion, Congress did not authorize the prosecution of a civilian who accepted a military base Commander's invitation to attend an open house on the base simply because the civilian had been "removed therefrom" and "ordered not to reenter" some nine years earlier.

I respectfully dissent.

.

---

[12] No removal occurred until respondent was removed from the open house, and no new bar order was ever delivered to him. App. 28, 30.

[13] The relevant Air Force Regulation, n. 8, *supra*, however, does carefully distinguish between the power to exclude and the power to prosecute.