Alan David **ROSENFELD**,
Plaintiff-Appellant,

v.

Robert **KETTER**, Ronald Stein, and Lee Griffin, Defendants-Appellees.

No. 1078, Docket 87–7024.

United States Court of Appeals, Second Circuit.

Argued April 27, 1987.

Decided May 27, 1987.

Alan David Rosenfeld, pro se.

Daniel Smirlock, Asst. Atty. Gen., of the State of N.Y., Albany, N.Y. (Robert Abrams, Atty. Gen., Peter H. Schiff, Deputy Sol. Gen., Wayne L. Benjamin and Lew A. Millenbach, Asst. Attys. Gen., Albany, N.Y., of counsel), for defendants-appellees.

Before FEINBERG, Chief Judge, KEARSE and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Alan Rosenfeld appeals from a grant of summary judgment dismissing his complaint against three officials of the State University of New York at Buffalo ("SUNYAB" or "University"). Rosenfeld's complaint sought, *inter alia,* declaratory relief and damages pursuant to 42 U.S.C. § 1983 (1982) for alleged deprivations of his due process and first amendment rights as a result of disciplinary action taken against him. We affirm.

## BACKGROUND

The facts are essentially undisputed. In February 1982, Rosenfeld was a third-year law student at SUNYAB. Students had scheduled a rally for the evening of February 26 to protest the University's plan to convert the student union, known as Squire Hall, into a facility for the dental school. The students planned to remain in Squire Hall past its 2:00 a.m. closing time. Rosenfeld and other students intended to be present at the rally as "legal observers" to witness any arrests and prevent violence.

On the afternoon of February 26, Rosenfeld described his plans to Ronald Stein, assistant to University President Robert Ketter. Stein informed him that the building would be closed at 2:00 a.m. the next morning and that anyone who remained after being told to leave would be arrested pursuant to President Ketter's instructions. Stein stated that no exceptions would be made for "legal observers." Stein relayed Rosenfeld's plans to Ketter, who reiterated his instructions to arrest anyone who did not leave the building. Stein then conveyed Rosenfeld's plans and Ketter's instructions to Lee Griffin, director of public safety at SUNYAB, and Griffin's assistant, John Grela.

That evening, Rosenfeld attended the Squire Hall rally. At approximately 2:00 a.m. on February 27, Griffin announced to those in the building that they no longer had permission to remain and that they had ten minutes to leave. He further stated that those who did not leave would be arrested and that if they were students, they would also be suspended. Rosenfeld concedes that Griffin's general announcement was repeated several times and that Griffin and Grela personally told him that he too would be arrested if he remained in the building. At some point thereafter, Rosenfeld attempted "once again" (in his words) to explain to Griffin that he was present not as a participant in the rally, but only as a witness to the arrests and would voluntarily leave the building after the arrests were completed. Griffin told Rosenfeld that he would not be allowed to observe because he would be arrested if he did not leave the building.

At about 2:40 a.m., Rosenfeld, then the sole "legal observer" remaining in the building, was arrested and charged with third-degree criminal trespass. Following his arrest, he was served with a notice indicating that he had been "temporarily suspended immediately as a student," which meant that all of his "rights and privileges as a University student [we]re suspended" and that he was "barred from

participating in any University activity or entering onto or being in any property owned or operated by [SUNYAB]." The notice did not state the duration of the temporary suspension, but the attached summons did indicate that a formal hearing before the Hearing Committee for the Maintenance of Public Order was scheduled for March 20.

Rosenfeld was released from custody sometime before 4:00 a.m. on February 27. Later that day, he requested and received an informal hearing before President Ketter concerning his suspension. At the hearing, Ketter concluded that Rosenfeld might continue to disrupt the orderly operations of SUNYAB and therefore declined to remove the temporary suspension. Two days later, on March 1, Rosenfeld received a second informal hearing before Steven Sample, who had replaced Ketter as president earlier that day. Sample lifted Rosenfeld's temporary suspension on March 3.

The formal hearing, originally scheduled for March 20, was held on March 13. The Hearing Board found that Rosenfeld had violated University Rule 535.3g, which prohibits persons from refusing to leave a building after being told to do so by an authorized administrative officer. Rosenfeld was therefore placed on disciplinary probation for the remainder of the spring 1982 semester.

On July 1, 1982, Rosenfeld commenced this action pursuant to 42 U.S.C. § 1983 seeking declaratory relief and damages. On December 10, 1986, Judge Elfvin granted summary judgment against him. On appeal, Rosenfeld limits his arguments to two claims: first, that his suspension on the morning of February 27 without a pre-deprivation hearing violated his right to due process; and, second, that the provisions of the suspension order prohibiting him from entering SUNYAB property violated his first amendment rights. Finding these claims to be without merit, we affirm.

## DISCUSSION

### (1) Due Process Claim

■ Relying on *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975),

Rosenfeld argues that he was denied due process because he was not afforded a hearing before he was suspended from February 27 to March 3. In *Goss*, the Supreme Court held that a high school student facing temporary suspension "of 10 days or less" must "be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.*, at 581, 95 S.Ct. at 740. A formal hearing is unnecessary. "In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred." *Id.*, at 582, 95 S.Ct. at 740. While this requirement "add[s] little to the factfinding function where the disciplinarian himself has witnessed the conduct forming the basis for the charge[,] ... things are not always as they seem to be, and the student will at least have the opportunity to characterize his conduct and put it in what he deems the proper context." *Id.* at 584, 95 S.Ct. at 741.

The conceded facts plainly reveal that Rosenfeld was afforded all of the process required by *Goss*. Rosenfeld remained in Squire Hall after being asked to leave, and there was thus no doubt as to the relevant facts. His conversation with Stein on the afternoon before the demonstration afforded him an opportunity to air his claim of immunity as a "legal observer" with a university official. Moreover, just before Rosenfeld's arrest and suspension, Griffin warned him to leave, Rosenfeld "once again" argued his claim of immunity, and he was told that it would not be accepted. These discussions afforded Rosenfeld the opportunity required by *Goss* to characterize his conduct, put it in the proper context and urge that University rules not be enforced against him. An additional or more formal hearing would have been wholly redundant.

### (2) First Amendment Claim

■ Rosenfeld argues that the terms of the suspension order, which prohibited him

from participating in any University activity or entering any University property, violated his first amendment rights. He contends that those restrictions deprived him of the opportunity to participate in the cultural and political activities at the University that are open to students and the general public. We find this claim to be entirely without merit.

The suspension order did not prevent Rosenfeld from participating in any political activity, speaking on any subject or assembling with any group. The order merely barred him from doing those things, or anything at all, *at the University.* Rosenfeld has not argued that this restriction was not reasonably related to the University's interests in punishing him and preventing further disruption—interests that are unrelated to the suppression of speech. The Supreme Court has held that in circumstances such as these "an incidental burden on speech is no greater than is essential, and therefore is permissible . . ., so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 2907, 86 L.Ed.2d 536 (1985). We will not second-guess the University's view that excluding Rosenfeld from campus was the most appropriate method of promoting the University's interests in this case. *See id.* Given the virtually unlimited opportunities for free expression that remained available to Rosenfeld, he simply has not stated a valid claim under the first amendment. *See Center for Participant Education v. Marshall,* 337 F.Supp. 126, 134–35 (N.D.Fla.1972) (rejecting first amendment claim by student who was dismissed for campus disruption and violation of university president's executive order); *see also Albertini,* 472 U.S. at 689, 105 S.Ct. at 2907 (military commanders may exclude from base open houses individuals holding "bar letters" prohibiting them from entering base without official permission).

The decision of the district court is therefore affirmed.