**Andrea LARK and the New York City Church of Christ, Plaintiffs,**

v.

**William LACY, President, Purchase College, State University of New York (SUNY); William Frankel, Director of Student Development and Campus Activities; Ronald Herron, Vice President of Student Affairs; Cindy Long Porter, Judicial Officer for The Office of Residential Life; Paul Nicholson, Director of The Educational Opportunity Program; Christopher Beach, Director of the Performing Arts Center at SUNY (PAC); David Baer, Manager of the PAC; Thomas F. Egan, Erland E. Kailbourne, Edward F. Cox, Randy A. Daniels, Candace DeRussy, Arnold B. Gardner, Louis T. Howard, Pamela R. Jacobs, Nicole Kim, Miles**

L. Lasser, Edward S. Nelson, Celine R. Paquete, Paul R. Perez, Celine Traylor and Harvey F. Wachsman, as Members of the SUNY Board of Trustees; All in Their Individual and Official Capacities, Defendants.

No. 99 Civ. 0228(CM).

United States District Court, S.D. New York.

April 15, 1999.

Jonathan S. Abady, Emery, Cuti, Brinckerhoff & Abady P.C., New York City, for Andrea Lark, plaintiffs.

Richard Lombardo, Atty. General of the State of NY, Asst. Atty. General, White Plains, NY, for defendants.

MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

McMAHON, District Judge.

Plaintiffs Andrea Lark, a part-time student at the Purchase College of the State

University of New York ("SUNY Purchase" or the "College"), and the New York City Church of Christ (the "COC"), a self-described "traditional Christian evangelical denomination" and regional affiliate of the International Church of Christ, commenced this action and brought this motion by order to show cause signed on January 12, 1999 by The Hon. Sidney Stein of this Court. The case was then transferred to White Plains and assigned to me. On this motion, Plaintiffs seek a preliminary injunction: (1) lifting Ms. Lark's suspension as a student at SUNY Purchase and (2) reinstating the COC's license to use the SUNY Purchase Performing Arts Center (the "PAC") for the conduct of religious services during the pendency of this action.

For the following reasons, Plaintiffs' motion is denied with respect to Ms. Lark and granted with respect to the COC.

## I. Statement of Facts

### A. Andrea Lark's Suspension

Plaintiff Andrea Lark is a member of the COC. She is currently a full-time employee of the COC as well. Ms. Lark enrolled as a full-time student at SUNY Purchase in the Spring 1997 semester. Subsequent to that semester, when Ms. Lark began working full-time for the COC, she reduced her course load to one class during each of the Fall 1997 and Spring 1998 semesters.

SUNY Purchase suspended Ms. Lark for the Fall 1998 and Spring 1999 semesters based on its determination that she had violated College policies by intimidating and harassing a fellow student. The parties have agreed to "suspend" Ms.

Lark's suspension for the Spring 1999 semester while Plaintiffs' preliminary injunction motion is *sub judice;* accordingly, Ms. Lark is currently enrolled in one class at SUNY Purchase.[1]

### (1) Formation of Bible Discussion Group

Sometime during the Fall of 1996, SUNY Purchase students who were members of the COC organized an informal bible discussion group to meet on the SUNY Purchase campus. The group held its weekly "Bible Talk" meetings throughout that semester and into the following year, using space provided by SUNY Purchase.[2] In the fall of 1996 and again in the beginning of the Spring 1997 semester, Defendant William Frankel, Director of Student Development and Campus Activities at SUNY Purchase, expressed to Mr. Michael Dundie (a SUNY Purchase student and COC member) his concern about students who reportedly had felt pressured to participate in Bible Talk meetings. *See* Affidavit of William Frankel ("Frankel aff."), ¶¶ 6, 9–11. Mr. Dundie disputed the allegations and invited Mr. Frankel to attend a Bible Talk meeting, which Mr. Frankel did, along with members of his staff, early in the Spring 1997 semester. *See* Frankel aff., ¶¶ 11–12. Mr. Frankel observed the Bible Talk meeting, but did not speak or participate in any way. Ms. Lark found this intimidating, *see* Declaration of Andrea Lark ("Lark decl."), ¶ 11; *see also* Frankel aff., ¶ 12, but there is no evidence in this record to suggest that Mr. Frankel intended to make the discussion group members un-

1. Ms. Lark had already served the first semester of her suspension, or one-half of the full sanction, by the time Plaintiffs commenced this action on January 12, 1999.

2. The parties' submissions conflict over when the weekly Bible Talk meetings began. Ms. Lark alleges that she "started an informal bible discussion group with another SUNY student [and COC member], Michael Dundie"

in the Spring 1997 semester. Declaration of Andrea Lark ("Lark decl."), ¶ 10. Defendant William Frankel contends that Mr. Dundie—not Ms. Lark—first sought and received authorization to hold the "Bible Talk" meetings on campus property during the Fall 1996 semester, prior to Ms. Lark's enrollment as a student at SUNY Purchase. *See* Affidavit of William Frankel ("Frankel aff."), ¶¶ 3–4.

comfortable through his silent presence in their midst.

Mr. Frankel concluded, based upon the Bible Talk meeting he attended, that several attendees of this ostensibly student-organized bible discussion group were not, in fact, SUNY Purchase students. *See* Frankel aff., ¶¶ 13, 16. One non-student participant, Jeffrey Schachinger, a COC minister and occasional "invited guest" at Bible Talk, appeared to preside over the meeting. *See id.; see also* Lark decl., ¶ 10.

Days later, Mr. Frankel met with Ms. Lark and Mr. Dundie (the parties dispute at whose behest), and expressed his concern that the Bible Talk meetings might be an attempt to circumvent SUNY Purchase's facility rental policy and "obtain[ ] a rental-free forum for the Reverend Schachinger under the guise of a student group meeting." Frankel aff., ¶¶ 16–17. SUNY Purchase's "Use of Facilities" policy requires that members of the public—unlike students—must obtain a permit, pay rent and comply with certain conditions in order to use certain campus facilities. *See* Frankel aff., ¶ 16 and Exh. A. Student groups, by contrast, may use these facilities subject to availability and prior reservation with Mr. Frankel's office. *See* Frankel aff., ¶ 16.

Ms. Lark alleges that Mr. Frankel advised her at this meeting that Rev. Schachinger could no longer visit or lead Bible Talk meetings and, further, that no off-campus speaker could speak or lead bible discussions without Mr. Frankel's prior approval. *See* Lark decl., ¶ 12. Mr. Frankel maintains that he merely asked Ms. Lark and Mr. Dundie to register outside guests (*i.e.*, non-students attending Bible Talk) with his office. He denies barring Rev. Schachinger's future attendance or requir-

ing "pre-clearance" of any guests. *See* Frankel aff., ¶¶ 17–19.

Mr. Frankel's concerns about unauthorized non-student use of campus facilities persisted and he met again with Ms. Lark and Mr. Dundie in late February 1998, at which time he reiterated that they were not to hold bible study meetings on campus without first requesting a room from his office, in accordance with College policy. They denied violating College policy in scheduling their Bible Talk meetings. The conversation then digressed to a number of other topics, including discussion of an irreverent sticker Mr. Frankel had placed on the wall of his office,[3] student complaints of harassment by Bible Talk devotees and COC members, and examples of behavior that Mr. Frankel characterized as religious intolerance by various groups. At some point during the exchange, Mr. Frankel made statements that linked the COC to the Ku Klux Klan in a manner that Ms. Lark found offensive.

Around the time of his first contacts with Michael Dundie, Mr. Frankel took a keen interest in mitigating the influence of cults and other predatory groups on the SUNY Purchase student body. Mr. Frankel organized a task force on cults in February 1997, which concluded, *inter alia*, that the College must develop and maintain a consistent policy with respect to the rental and use of College property. *See* Frankel aff., ¶ 22. The committee decided to implement an educational awareness plan to train students, faculty and staff, and to distribute educational materials among the student body. One such document, entitled "A Guide to Making Safe Judgments About Destructive Groups on Campus" (attached as Exh. A to Affidavit of Ronald Herron ("Herron aff.")), provides recommendations to help students identify and avoid cults and similar "destructive" groups active on the SUNY Pur-

---

**3.** There is no evidence before me to suggest that the sticker, which read "Jesus, Protect Me From Your Followers," was specifically directed towards the COC. As Plaintiffs' counsel acknowledged at oral argument, the stick-er is widely circulated and used by many persons—including devout Christians—to make a statement about the so-called "religious right."

chase campus. The literature mentions no allegedly destructive groups by name, but instead offers common characteristics and suggests both religious and secular resources for those seeking advice on whether to affiliate themselves with a particular group. The literature does *not*, as Ms. Lark alleges, criticize the COC or even mention it by name. *See* Lark decl., ¶ 24.

The SUNY Purchase task force also decided to sponsor a presentation by Mr. Ronald Loomis, an expert on cults with a background in student residential life and twenty years of experience studying cults and mind control. Loomis presented his cult awareness education program at SUNY Purchase on April 14, 1998, at the invitation of the College administration and the Students' Union. *See* Affidavit of Ronald Loomis, ¶ 8. He had previously presented similar programs at SUNY Purchase twice before, on March 2, 1992 and on November 28, 1995. *See id.*

At some point during the 1997–98 academic year, Ms. Lark and Mr. Dundie mentioned to Mr. Frankel their desire to obtain club status for the COC. *See* Lark decl., ¶ 14, Frankel aff., ¶ 21. Plaintiffs claim that, during this conversation, Mr. Frankel expressed his intention to do all he could to prevent the COC from being recognized as a student club. *See* Lark decl., ¶ 14. Mr. Frankel, of course, denies making this comment and avers that he suggested Ms. Lark and Mr. Dundie should contact the SUNY Purchase Students' Union concerning club status. *See* Frankel aff., ¶ 21. Mr. Frankel also contends that the Students' Union has exclusive control over deciding which organizations receive club status—a point Plaintiffs do not dispute—and that he has never expressed his views concerning whether a particular group should receive club status. *See id.*

A campus newspaper, *The Pendulum*, interviewed Mr. Frankel in February 1998 and questioned him about whether the SUNY Purchase administration intended to take any action with respect to the COC's solicitation activities on campus. *See* Frankel aff., ¶ 30. Plaintiffs refer to Mr. Frankel's quoted remarks, which appeared in a Pendulum newspaper article on the COC (attached as Exh. B to Lark decl.), as further evidence of Mr. Frankel's anti-COC bias. *See* Lark decl., ¶ 25. Mr. Frankel's statements reflect that the College was in the midst of revising its policies so that it could ban groups from campus if they harassed or intimidated students. Frankel aff., ¶ 30; *see also* Exh. B to Lark decl.

Not surprisingly, the parties' respective descriptions of the February 1998 meeting and other conversations diverge at numerous points. *Compare* Frankel aff., ¶¶ 20–21, 26–27 *with* Lark decl., ¶¶ 14, 16–22. Nonetheless, the record is sufficiently clear for me to conclude that Mr. Frankel exhibited hostility towards the COC and its adherents in some of his interactions with Ms. Lark.

### (2) *Lark's Disciplinary Hearing*

In or about April 1998, Dionnie Walker, a SUNY Purchase student, complained to Mr. Frankel that Ms. Lark had intimidated her, pressured her into attending a COC-affiliated trip to Massachusetts, and tried to prevent her from leaving someone else's room and visiting her family. *See* Frankel aff., ¶¶ 32–33. Mr. Frankel referred Ms. Walker to Paul Nicholson, Director of the Educational Opportunity Program, a counseling program for SUNY Purchase students, and Ms. Walker complained to Mr. Nicholson about Ms. Lark's alleged conduct.

Ms. Walker told Mr. Nicholson that Ms. Lark had pressured her to attend the recent Massachusetts function so that she might confess her sins, notwithstanding Ms. Walker's protestations that she had recently failed her midterm examinations and had promised her father that she would visit him that weekend. *See* Transcript of Lark's Disciplinary Hearing ("Hearing Transcript"), attached as Exh.

H to Affidavit of Cindy Long Porter ("Long Porter aff."), at 5.[4] On Saturday, following the overnight trip, Ms. Lark and the other students returned to campus just before the 6:00 p.m. bus that Ms. Walker needed to catch to return home. *See id.* Ms. Walker alleged that Ms. Lark promised to drive her home, but when Ms. Walker showed up for her ride, she found Ms. Lark in a room accompanied by several other COC members. *See* Hearing Transcript at 5, 20. Rather than provide a ride, Ms. Lark told Ms. Walker to stay in the room with the other women and then tried to dissuade her from returning home because she would miss COC church services the following morning. *See* Hearing Transcript at 6, 20. According to Ms. Walker, when she repeatedly stated her desire to go home, Ms. Lark insisted that Ms. Walker stay so they could pray together. *See id.* Ms. Walker recounted: "I was expressing to them about 5 or 6 times that I want to go home, I just want to go home, but she keeps saying to me you know you need to pray, you need to stay on campus, you need to go to church tomorrow." *See* Hearing Transcript at 20.

Ms. Walker testified that Ms. Lark repeatedly threatened that the Devil would take her soul if she left campus to be with her family. *See* Hearing Transcript at 6. As Ms. Walker stated:

> [Lark said] you just had the devil in you and he was cursing you and everything and [Lark] was telling me I can't even go home ya know, cause if I do go home, my soul is going to be taken away … she was saying you know if I go home, I'm never going to be able to come back … and I started to cry and I was like I just want to go home, I just want to go home and kept repeating it, and then she shook [sic] my hand and I looked in her eyes and everything and she was like "why don't we pray" ya know, and I

turned my head away, I was like I don't want to pray, I just want to go home. *Id.*

Ms. Walker missed her bus and did not receive the promised ride from Ms. Lark. She ultimately withdrew herself from Ms. Lark's company so that she could "pray" alone. In fact, she spent the night deeply depressed and contemplated suicide. Concerning the events of that night, Ms. Walker recalled:

> I went upstairs to my room and I started to cry. And I went in the room and I took off my clothes and everything and I started to write a letter to the Heavenly Father and cause pretty much I didn't want to be around anymore … I was writing a letter because I pretty much I was thinkin' of killing myself. …

*Id.* at 6, 7.

Shortly thereafter, Ms. Walker complained to Mr. Nicholson.

Mr. Nicholson explained SUNY Purchase's judicial process to Ms. Walker and advised her that she could make a formal complaint against Ms. Lark. Approximately one week later, Ms. Walker told Mr. Nicholson that she wished to file a complaint. Mr. Nicholson conducted an audiotaped interview of Ms. Walker, which he submitted on her behalf in lieu of a written complaint to Cindy Long Porter, SUNY Purchase's Judicial Officer.

Ms. Long Porter reviewed the audiotape and then interviewed Ms. Walker to clarify some of her statements and to confirm that Ms. Walker wished to file a complaint against Ms. Lark. Ms. Walker indicated that she did. Ms. Long Porter then found, based on the audiotaped interview and her subsequent questioning of Ms. Walker, that there was reasonable cause to believe that Ms. Lark may have violated Sections C(2), C(3), C(4)(f), and C(5) of the SUNY Purchase College Council's Community

---

4. There are differences between Plaintiffs' and Defendants' respective transcriptions of Ms. Walker's interview. As Plaintiffs, at oral argument, stated that they are willing to argue their preliminary injunction application on Defendants' facts, I cite exclusively to Defendants' transcript (attached as Exh. H to Long Porter aff.)

Standards of Conduct ("CSC"), attached as Exh. A to Long Porter aff.[5]

In accordance with the CSC, Ms. Long Porter sent a letter to Ms. Lark on May 5, 1998 advising her of the charges she faced, and the minimum and maximum available sanctions. The notice stated that the charges would be reviewed at an initial conference on May 12, 1998. *See* Letter from Long Porter to Lark, dated May 5, 1998, (attached as Exh. B to Long Porter aff.). The letter noted that, if Ms. Lark failed to appear at the initial conference, the charges would be deemed admitted, as provided in CSC § V(C)(3)(a). Ms. Long Porter's office sent the letter to Ms. Lark, via certified mail, to her home address, and also placed a copy in Ms. Lark's campus mailbox. *See* Long Porter aff., ¶ 5.

Ms. Lark failed to appear at the May 12, 1998 initial conference and the charges were deemed admitted, as Ms. Long Porter's May 5, 1998 letter had warned. Based upon Ms. Lark's *de facto* admission of the charges, the nature of the conduct, and the seriousness of the harm caused to Ms. Walker, Ms. Long Porter imposed upon Ms. Lark a sanction of one academic year suspension followed by one semester of disciplinary probation. *See* Long Porter aff., ¶ 7. Ms. Long Porter advised Ms. Lark via certified mail of the findings, the sanction, and her right to an appeal. *See* Letter from Long Porter to Lark, dated July 8, 1998 (attached as Exh. C to Long Porter aff.). Ms. Lark received this letter on July 10, 1998. *See* Cplt., ¶ 47.

Ms. Lark delivered to Ms. Long Porter a letter on July 15, 1998 appealing the sanction and advising that she had not received notice of the initial conference. *See* Letter from Lark to Long Porter, dated July 15, 1998 (attached as Exh. D to Long Porter aff.). Ms. Long Porter wrote back that same day, withdrawing her prior findings and setting a new initial conference for July 23, 1998. *See* Letter from Long Porter to Lark, dated July 15, 1998 (attached as Exh. E to Long Porter aff.)

The second initial conference, rescheduled once (at Ms. Long Porter's behest), was held on July 28, 1998 with Ms. Lark and Ms. Long Porter in attendance. Ms. Long Porter advised Ms. Lark of the complainant's identity (Ms. Walker), played the audio taped interview, and discussed the substance of the charges. Ms. Long Porter also told Ms. Lark then that she had drafted the charges based on Ms. Walker's testimony and that she (Ms. Long Porter) would conduct the hearing as the College Judicial Officer, since no Judicial Board would be available at her disciplinary hearing, because it was summer. Ms. Lark raised no objection to any of this and signed a form indicating that she wanted her case heard before an Administrative Hearing Officer, thus waiving any objection she may have had to the absence of a Judicial Board. *See* Long Porter aff., ¶¶ 12–13 & Exh. F.

Ms. Lark's disciplinary hearing was conducted on August 7, 1998 with Ms. Long Porter presiding as Judicial Officer. *See* Long Porter aff., ¶ 15. At that hearing, Ms. Long Porter introduced Ms. Walker's audio taped interview as the complainant's

---

5. CSC § III(C)(2) punishes persons who: "threaten[ ], harass[ ], stalk[ ], or intimidate[ ] any person;"

CSC § III(C)(3) punishes persons who: "coerce[ ], detain[ ], or use[ ] physical force in a manner which endangers the health or safety of any person;"

CSC § III(C)(4) punishes individuals or groups who participate in "practices in connection with initiation into or affiliation with any group." Sub-section (f) prohibits activity which "forces or requires conduct that would embarrass or negatively affect the dignity of the individual, or the creation of situations which cause psychological or undue emotional strain;"

This provision is fairly characterized as an anti-hazing rule.

CSC § III(C)(5) punishes persons who: "engage[ ] in any behavior against a person which significantly interrupts or prevents that person from carrying out duties and responsibilities associated with his/her role as faculty, staff or students at the College."

*See* Exh. A to Long Porter aff., at 100.

testimony and several other witnesses testified. Ms. Lark was allowed to question Ms. Walker and the other witnesses by giving questions to Ms. Long Porter, who then directed them to the respective witness. Ms. Walker was able to question Ms. Lark's witnesses in the same fashion. *See* Long Porter aff., ¶ 16. This procedure comported with CSC §§ V(C)(4)(g) & (6)(f) of SUNY Purchase's disciplinary procedures.

In addition to receiving the live and recorded witness testimony, Ms. Long Porter read into the record a written statement by Paul Nicholson, in which he recounted his conversation with Ms. Walker and recommended that Ms. Lark be punished severely. Ms. Walker submitted the statement as evidence to substantiate her allegations. Ms. Long Porter subsequently decided to disregard Mr. Nicholson's statement because he lacked personal knowledge of the facts underlying Ms. Walker's allegations and because Ms. Lark did not have the opportunity to question him. Consequently, Ms. Long Porter avers, she "gave absolutely no consideration to Mr. Nicholson's statement in determining either whether Ms. Lark was responsible for the charges or the appropriate sanction." Long Porter aff., ¶ 17.

After the hearing, Ms. Long Porter reviewed the testimony in the record. She made a finding that, where Ms. Walker's and Ms. Lark's testimony conflicted, Ms. Walker's was more credible based upon demeanor and the degree to which other credible witnesses corroborated Ms. Walker's allegations. *See* Long Porter aff., ¶ 18, n. 3. Ms. Long Porter made the following Judicial Action Findings based upon her review of the disciplinary hearing record:

Charge 1: "I believed it more likely than not that Ms. Walker was intimidated by you."

Charge 2: "I believed it more likely than not that you detained Ms. Walker from leaving the campus after your return from the Springfield trip."

Charge 3: "I believe it more likely than not that you collectively and individually made statements to Ms. Walker that caused her embarrassment and psychological strain."

Charge 4: "I do not believe that you prevented Ms. Walker from carrying out her responsibilities as a student."

Letter from Long Porter to Lark, dated August 11, 1998 (attached as Exh. I to Long Porter aff.).

Ms. Long Porter concluded that it had been established by a preponderance of the evidence (the standard mandated by CSC § V(C)(4)(h)) that Ms. Lark was responsible for conduct in violation of College policies, as alleged in the first three charges against her. With respect to charge 1 (CSC § III(C)(2): "threatens, harasses, stalks, or intimidates any person"), Ms. Long Porter found that Ms. Lark had intimidated Ms. Walker into going on the COC Massachusetts trip against her stated wishes and then pressured Ms. Walker to remain on campus afterwards, rather than returning home to her father's.[6] *See* Long Porter aff., ¶ 19. With respect to charge 2, Ms. Long Porter found that Ms. Lark's involvement in detaining Ms. Walker from leaving campus after the Massachusetts trip violated CSC § III(C)(3) ("coerces, detains, or uses physical force in a manner which endan-

---

**6.** Ms. Long Porter reached this conclusion based upon her stated findings that:

Ms. Walker felt like she could not say 'no' to Ms. Lark, looked at [Ms. Lark] as God, and had communicated these feelings to Ms. Lark prior to their trip to Massachu-

setts. I believe that Ms. Lark used this knowledge to get Ms. Walker to do what Ms. Lark wanted, i.e., going on the Massachusetts trip and remaining on campus after their return.

Long Porter aff., ¶ 19.

gers the health or safety of any person"). *See* Long Porter aff., ¶ 20.

As to charge 3 (III)(C)(4)(f): "forces or requires conduct that would embarrass or negatively affect the dignity of the individual, or the creation of situations which cause psychological or undue emotional strain"), Ms. Long Porter found that Ms. Lark's conduct with respect to the Massachusetts trip caused Ms. Walker psychological strain, as did "Ms. Lark's attempts to convince Ms. Walker to give up her 'nets' . . . includ[ing] Ms. Lark grabbing Ms. Walker's 'name necklace', which she was wearing, containing the names of Ms. Walker and her boyfriend, and stating, 'this is one of the "nets" that is holding you back.'" Long Porter aff., ¶ 21.

Ms. Long Porter dismissed the fourth charge, finding insufficient evidence to conclude that Ms. Lark prevented Ms. Walker from carrying out her responsibilities as a student (CSC § III(C)(5)). *See* Long Porter aff., ¶ 22.

For a sanction, Ms. Long Porter imposed a two semester suspension, which falls somewhere between the minimum possible sanction (Disciplinary Probation) and the maximum (Expulsion) for these charges. *See* Long Porter aff., ¶ 23; *see also* CSC § III(C). Ms. Long Porter opted against the maximum sanction, which is reserved for the most severe violations, because Ms. Lark had no previous disciplinary record. *See* Long Porter aff., ¶ 23. She decided not to impose the minimum sanction for a variety of reasons, including her conclusions that Ms. Lark had taken advantage of Ms. Walker's vulnerability and susceptibility to influence; Ms. Lark's conduct had inflicted a severe psychologi-

cal effect on Ms. Walker; and Ms. Lark expressed no remorse for any damage she may have caused to Ms. Walker.

Consistent with SUNY Purchase policy, Ms. Lark was designated *persona non grata* through the duration of her suspension. *See* CSC § IV(C)(2)(h). This means that she was not allowed to enter the SUNY Purchase campus for any reason except to engage in business of the College. *See* Herron aff., ¶ 22, n. 13. Ms. Long Porter advised Ms. Lark, by letter, of her suspension and concomitant *persona non grata* status. *See* Letter from Long Porter to Lark, dated August 11, 1998 (attached as Exh. I to Long Porter aff.). Ms. Lark received the letter that same day, on August 11, 1998. *See* Cplt., ¶ 92.

### (3) *Lark's Appeal of Her Suspension*

Defendants received a letter from Ms. Lark, on August 18, 1998, appealing her suspension based upon allegations of bias on the part of Ms. Long Porter and Mr. Frankel, as well as various alleged procedural violations in her disciplinary proceedings.[7] *See* Letter from Lark to Herron, dated August 17, 1998 (attached as Exh. B to Herron aff.).

An Appeals Board considered Ms. Lark's appeal on August 25, 1998 and determined that the appeal should be denied. The Appeals Board found that: "[p]roper procedures were followed according to college policies outlined in the student handbook. The student had a fair non-prejudicial hearing and we find with the multiple number of charges proportionate sanctions were given." *See* Notice of Appeal (attached as Exh. D to Herron aff.).[8] Mr.

7. SUNY Purchase accepted Ms. Lark's request for an appeal notwithstanding the fact that she sent it after the August 14 deadline. *See* CSC § V(C)(7)(b)(1) (requiring appeal to be submitted within three working days of the student's receipt of the Judicial Action Finding).

8. The Appeals Board was composed of three members of the SUNY Purchase staff and faculty, none of whom was involved in the

case's initial hearing. Plaintiffs take no issue with the College's failure to include a student on the Appeals Board, as required by CSC § V(B)(4). In the absence of any discussion by the parties of this variance, I infer that, just as Defendants cannot gather a Judicial Board during the summer months, they are similarly unable to insure student representation on the Appeals Boards at that time.

Ronald Herron, SUNY Purchase's Vice President for Student Affairs, advised Ms. Lark, by letter, of the Appeals Board's conclusion and assured her that he would "review[ ] the matter to assure that the decision honors all aspects of your due process rights" and College policies, in accordance with CSC § V(C)(7)(b)(5). *See* Letter from Herron to Lark, dated August 28, 1998 (attached as Exh. E to Herron aff.).

Thereafter, Mr. Herron conducted a *de novo* review of Ms. Lark's appeal. He reviewed the audio tape of the disciplinary hearing and considered the allegations raised in Ms. Lark's letter of appeal to determine whether legitimate grounds for appeal existed.[9] He concluded that there were none. *See* Herron aff., ¶¶ 18–19. Mr. Herron found no support for Ms. Lark's contentions that Ms. Long Porter was biased against her or that she had been prejudiced by procedural irregularities in the disciplinary proceedings. He found the sanction sufficiently proportional to the violations, particularly in light of "Ms. Lark's lack of any understanding, remorse, or regret for the effect that her conduct had had on Ms. Walker." *Id.,* ¶ 19. Moreover, Mr. Herron found Ms. Walker's audio taped testimony to be "direct, genuine, and believable" while Ms. Lark seemed "glib, dismissive, and occasionally disingenuous." *Id.,* ¶ 20.

Considering Ms. Lark's conduct, as established by the disciplinary hearing record, Mr. Herron concluded that Ms. Lark had intimidated, detained, and caused psychological strain to Ms. Walker. Mr. Herron found that: "knowing that she could influence and manipulate Ms. Walker, Ms. Lark employed fear and intimidation to obtain the result that she wanted and Ms. Walker did not." *Id.,* ¶ 21.

Mr. Herron advised Ms. Lark by letter that he had reviewed her appeal and was satisfied that the decisions made "honor all aspects of [SUNY Purchase]'s disciplinary procedures." Letter from Herron to Lark, dated September 3, 1998 (attached as Exh. F to Herron aff.). The letter advised Ms. Lark that her two semester suspension and *persona non grata* status would be imposed, effective immediately. *Id.*

Ms. Lark telephoned Mr. Herron later in September 1998 to inquire whether she might attend a COC religious service on campus, notwithstanding her *persona non grata* status. Mr. Herron informed her that she could only come on campus to transact business of the College—not to attend religious services. *See* Herron aff., ¶ 23; Lark decl., ¶ 60. Mr. Herron reiterated his response in a letter, allegedly at Ms. Lark's request. *See* Herron aff., ¶¶ 23–24; *see also* Letter from Herron to Lark, dated September 28, 1998 (attached as Exh. G to Herron aff.).

Four months later, Plaintiffs commenced this suit.

B. *Revocation of the COC's License to Use the PAC*

Plaintiff COC rented the PAC on a monthly basis for its Sunday religious services beginning in Summer 1996 and continuing most months until October 1998, when SUNY Purchase revoked its license, effective November 1, 1998. *See* Affidavit of Christopher Beach ("Beach aff."), ¶¶ 6,

---

9. The CSC provides three grounds for appeal:
 (1) fair consideration was not provided to the student, i.e., there is evidence
 that some aspect of the hearing was prejudicial, arbitrary, or capricious; or
 (2) new and significant information, not reasonably available at the time of the initial hearing, has become available; or

(3) the sanction or remedy imposed is not in due proportion to the nature and seriousness of the offense.
CSC § V(C)(7)(a).
Mr. Herron reasonably inferred from Ms. Lark's letter that she wished to appeal the ruling based on grounds (1) and (3).

8–12, 19–21. Each of the COC's permits to use the PAC provided that SUNY Purchase could revoke the license without liability upon thirty days written notice to the COC.[10] *See id.* ¶ 13. Defendants insist that, prior to receiving its first revocable permit to use the PAC, the COC accepted a requirement that church members were not to solicit others in the SUNY Purchase campus community to attend COC religious services. *See* Beach aff., ¶ 7. Plaintiffs dispute the terms of any agreed-upon limitation, but it does not matter because such an unconstitutional restriction upon the COC's religious expression would not be enforceable. In any event, the disputed agreement and the COC's alleged violation of it provide no justification for SUNY Purchase's decision to revoke the PAC license.

Defendants assert that "[t]he PAC fulfills [SUNY] Purchase's public service mission by making space available to commercial and not for profit organizations...." *Id.*, ¶ 3. Accordingly, *"any* organization that wishes to rent space at the PAC may do so under two conditions: that the space is available and that the purpose for which the space is to be utilized is consistent with or in furtherance of University purposes." *Id.* (emphasis added). Under these general guidelines, SUNY Purchase regularly opened its facility to a wide range of academic and non-academic entities for various purposes, including benefits for the American Cancer Society and United Cerebral Palsy; shareholder and other corporate meetings for Citibank, General Foods, IBM, NYNEX, the Bank of New York,

and PepsiCo; and private performances by the New York Philharmonic, Yo Yo Ma, Isaac Stern, the Alvin Ailey Dance Theater, Michael Feinstein, Dave Brubeck, Harry Belafonte, Bill Cosby, PDQ Bach, and many others. *See* Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction ("Pls.' Br."), at 17–18 and Exh. A (printout from the PAC internet website, "www.artscenter.org/rental.htm").

Defendants maintain that the "University purposes" requirement somehow limited access to the PAC.[11] However, in their papers and at oral argument, Defendants were unable to cite a single instance in which SUNY Purchase denied a request to rent the PAC because the group's purpose was *inconsistent* with University purposes. Moreover, when asked at oral argument what "University purpose" was served by several of the activities cited by Plaintiffs, Defendants responded "public service"—a catch-all "purpose" that seems limitless in light of the variety of PAC users. There is no evidence in this record that, prior to terminating the COC's license, SUNY Purchase ever denied access to the PAC to anyone who could pay the rent.

Nowhere in Defendants' papers is there any indication that SUNY Purchase was dissatisfied with the COC's use of the facility, though Plaintiffs' papers mention a few instances in which PAC staff members expressed concerns to COC volunteers. For example, in July 1997, Kevin Tomczak, the Associate House Manager at the PAC wrote to COC's volunteer rental representative, Diana Bulman, and asked her to look into reports that children attending COC services had repeatedly been using PAC telephones to call 911. *See* Letter

---

**10.** The parties dispute whether the COC enjoyed a contract or a revocable permit to use the PAC, but the distinction makes no difference to the resolution of the instant motion. The record is clear that SUNY Purchase provided the COC with a license to use the PAC for religious meetings and services, that the license was renewable on a monthly basis, and that the COC repeatedly renewed its li-

cense—often for many months at a time—until October 1998, when SUNY Purchase terminated the rental relationship. *See, e.g.,* Affidavit of Christopher Beach, ¶¶ 6, 8–12, 20.

**11.** It is not immediately clear to this Court what "University purposes" were served by at least some of these rentals.

from Tomczak to Bulman, dated July 31, 1997 (attached as Exh. B to Declaration of Diana Bulman ("Bulman decl.")). In her declaration, Bulman alleges that, on other occasions, the COC also received complaints that people were lingering on the premises after church services, and that baptisms being performed at the PAC were causing damage to the stage. *See* Bulman decl. ¶ 6. Bulman alleges that each of these concerns was resolved promptly. Defendants make no mention of these incidents, but allege that PAC staff members discussed several times with COC Minister, Jeffrey Schachinger, SUNY Purchase's requirement that COC members not solicit people on campus to attend the services. *See* Beach aff., ¶¶ 7, 15–16. According to Defendants, Rev. Schachinger promised not to do so. *See* Beach aff., ¶ 7.

In September 1998, Mr. Herron discussed with other members of the SUNY Purchase administration whether the COC's license to use the PAC should be revoked based on the alleged conduct of several part-time students at the school who were also paid employees of the COC. *See* Herron aff., ¶ 32. Mr. Herron was concerned about reports that the COC employees (including Ms. Lark) had violated the individual rights of SUNY Purchase students, and that church members had violated the alleged agreement not to solicit members of the campus community to attend religious services at the PAC. *See id.*, ¶¶ 30–31. The alleged violations of individual rights included "persistent solicitation, requiring participation in activities, interfering with private electronic communications, attempting to prevent students from having contact with their families, and using fear to gain compliance...." *Id.*, ¶ 30. During these deliberations, Christopher Beach, the PAC Director, advised Rev. Schachinger that SUNY Purchase might exercise its right to revoke the COC's license. *See* Beach aff., ¶ 17. David Baer, the Events Manager at the PAC, similarly notified Diana Bulman, a COC volunteer representative, and expressed to her the College's concern with

reported on-campus solicitation by COC members. *See* Affidavit of David Baer, ¶ 4.

SUNY Purchase President, William Lacy, instructed Mr. Beach, on or about September 30, 1998, to revoke the COC's license pursuant to paragraph "15" of the permit. *See* Beach aff., ¶ 18. Mr. Beach telephoned Rev. Schachinger and notified him of the imminent revocation, stating that it was "in the best interests of the college." *See id.*, ¶ 19. Mr. Beach followed with a letter confirming SUNY Purchase's intention to revoke the COC's license, effective November 1, 1998. *See* Letter of Beach to Schachinger, dated October 2, 1998 (attached as Exh. B to Beach aff.).

## II. *Legal Analysis: Standard for Preliminary Injunctive Relief*

The Second Circuit has long held preliminary injunctive relief to be an extraordinary remedy that should not routinely be granted. *See Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985). Ordinarily, to prevail on a motion for a preliminary injunction, plaintiffs must show that, without the injunctive relief, they will suffer irreparable harm and either (a) plaintiffs have a likelihood of success on the merits; or (b)(i) there are sufficiently serious questions going to the merits to make them a fair ground for litigation and (ii) a balance of hardships tips decidedly in plaintiffs' favor. *See Waldman Publishing Corp. v. Landoll, Inc.*, 43 F.3d 775, 779–80 (2d Cir.1994) (citing, *inter alia, Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir.1979)). The award of a preliminary injunction is an extraordinary and drastic remedy that will not be granted absent a clear showing that the plaintiffs have met their burden of proof. *See Beech–Nut, Inc. v. Warner–Lambert Co.*, 480 F.2d 801, 803 (2d Cir.1973); *Kraft General Foods, Inc. v. Allied Old English, Inc.*, 831 F.Supp. 123, 127 (S.D.N.Y.1993).

■ Where, as here, however, Plaintiffs seek to enjoin governmental action, they may not rely on the less rigorous "serious questions" alternative of the second prong, but instead must demonstrate a likelihood of success on the merits. *See Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir.1996). Defendants assert that SUNY Purchase's interest in protecting the psychological well being of its student body and preserving the learning environment on campus supported its actions against both Ms. Lark and the COC. *See* Memorandum of Law in Opposition to Motion for Preliminary Injunction ("Defs.' Br.") at 20, 33. Plaintiffs counter that the Defendants cannot claim to have acted in the public interest when, in fact, their actions appear to have been motivated by animus toward Plaintiffs' protected free expression, rather than in furtherance of any true governmental objectives.

I am persuaded that the COC will suffer irreparable harm without preliminary injunctive relief and that its claim is likely to succeed on the merits at trial. Thus, I need not resolve whether Plaintiffs are entitled to injunctive relief under the alternative, "serious questions" and "balance of hardships" standard in order to grant their motion with respect to the COC. As to Ms. Lark, I am persuaded that SUNY Purchase personnel acted in the public interest when they disciplined her; consequently, *Jolly's* standard applies to her motion for a preliminary injunction.

A. *Lark: Likelihood of Success on the Merits*

1. *Due Process*

■ Ms. Lark cobbles together a due process claim from her allegations that SUNY Purchase deviated from College policy at various stages in her disciplinary proceedings. She alleges the following violations of the College's Community Standards of Conduct (the "CSC"):

(1) Ms. Lark did not receive Ms. Long Porter's May 5, 1998 letter prior to the scheduled initial conference, in violation of her right to notice and a hearing under CSC §§ V(C)(2) and (6).

(2) The May 5, 1998 letter did not provide a sufficiently specific description of the charges against Ms. Lark, in violation of CSC § V(C)(2).

(3) Once she received actual notice, Ms. Lark was denied her initial conference for twelve days, in violation of CSC § V(C)(3)'s provision that an initial conference be held within seven working days of notification.

(4) Ms. Long Porter denied Ms. Lark the right to request a disciplinary hearing before the Judicial Board, in violation of CSC § V(C)(3)(e).

(5) Ms. Long Porter improperly instructed Ms. Walker on how to file charges and determined who would be charged.

(6) Ms. Lark was not permitted to have questions asked of Mr. Nicholson, whose written statement was read into the record on behalf of Ms. Walker. CSC § V(C)(6)(f) provides that "[accused s]tudents have the right to ... have questions asked of any individual participant in the hearing."

*See* Pls' Br. at 7–8.

Ms. Lark has not demonstrated that she is likely to prevail on the merits of her claim that SUNY Purchase violated her constitutional right to due process. On this record, most of Ms. Lark's allegations do not even suggest violations of College policy, let alone rise to the level, individually or collectively, of a deprivation of constitutional rights. Ms. Lark's objections to the manner and substance of her notice are meritless. She has alleged that she did not receive the May 5 notice letter, because she "had stopped checking regularly" her campus mailbox.[12] But Ms.

12. Lark decl., ¶ 31, n. 3.

Long Porter has sworn that she sent copies of the letter to locations reasonably calculated to notify Ms. Lark, a SUNY Purchase student, of the charges against her; *i.e.*, copies to her campus mailbox and to her last known off-campus address. Ms. Lark does not dispute this. Ms. Long Porter's efforts *were* reasonable. Moreover, Ms. Long Porter mitigated any conceivable prejudice occasioned by Ms. Lark's non-receipt of the notice by reopening the matter and scheduling a new initial conference as soon as she learned that Ms. Lark had not received the May 5 letter advising her of the charges.

As to the specificity of the charges, Ms. Lark's allegation reflects a misreading of university policy. CSC § V(C)(2) provides that "[t]he College Office handling the case ... shall develop a written specification of charges containing the allegations which may constitute violations of the [CSC]" adding that "these items will be specific and may include the names of witnesses...." Exh. A to Long Porter aff., at 112. In the following paragraph, the section provides that "[t]he accused shall be given written notification that he/she has been charged with violating a provision of the [CSC] within a reasonable time...." It is the latter sentence, not the former, that addresses the contents of the notice letter. Contrary to Plaintiffs' characterization, the rule merely requires that the College prepare a more specific account of the complainant's allegations; it does not mandate that the accused student receive such detail in her initial written notification.

Plaintiffs allude variously to the alleged bias of SUNY Purchase administrators and the impropriety of having Ms. Long Porter serve in multiple capacities throughout the disciplinary process: she counseled the complainant; she drafted the charges; she conducted the hearing; and she decided Ms. Lark's ultimate sanc-

tion. Assigning multiple roles to administrators may seem inimical to principles of impartial justice, but it is not uncommon and is perfectly acceptable in university disciplinary proceedings. *See, e.g., Gorman v. University of Rhode Island,* 837 F.2d 7, 15 (1st Cir.1988) (multiple roles by university administrator were not improper absent evidence that the student was denied a fair hearing as a result).

There is nothing in the record before this Court to demonstrate that Ms. Long Porter harbored hostility or bias towards Ms. Lark, or that Ms. Long Porter's involvement in multiple capacities violated Ms. Lark's due process rights. "Alleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences." *Gorman,* 837 F.2d at 15. Moreover, "the mere fact that the decision maker in a disciplinary hearing is also an administrative officer of the University does not in itself violate the dictates of due process." *Winnick v. Manning,* 460 F.2d 545, 549 (2d Cir.1972). As I have already noted, I am convinced that Mr. Frankel exhibited hostility towards Ms. Lark and the COC. This finding does not, however, lead ineluctably to the conclusion that Defendants violated Ms. Lark's rights, particularly in light of the fact that Mr. Frankel did not serve as Judicial Officer at Ms. Lark's hearing because of his prior involvement in the case. *See* Long Porter aff., ¶ 13, n. 11.

Ms. Lark alleges that SUNY Purchase's failure to provide a Judicial Board for her disciplinary hearing violated CSC § V(C)(3)(d) and (e).[13] While this section does grant the accused student the right to request a hearing before a Judicial Board, other sections of the CSC clearly modify that right when classes are not in session or when a formal hearing cannot be held in a timely manner. *See* CSC § IV(A)(2)(d) & n. ix. As the initial conference and

**13.** Section V(C)(3)(d) of the CSC provides, *inter alia,* that "[t]he accused student may elect to have the case heard by an Administrative or the Campus Judicial Officer." Sub-section (e) provides, *inter alia,* that "[t]he accused may request a hearing before the Judicial Board."

hearing took place during the summer, when classes are not in session at SUNY Purchase, Defendants did not violate College policy or Ms. Lark's rights by conducting the hearing without a Judicial Board, particularly in light of Ms. Lark's written consent to a hearing before an Administrative Hearing Officer. Had she refused to consent and demanded the convening of a Judicial Board, there is no evidence that SUNY Purchase would have denied her request.

SUNY Purchase's university policies clearly anticipate the occasional need for disciplinary hearings when Judicial Boards are unavailable and the failure to provide one here cannot fairly be characterized as a violation of those policies. The same could be said for the unnoted (by the parties) failure to include a student on the Appeals Board. In any event, the minor deviations Ms. Lark alleges do not rise to constitutional proportions and do not themselves comprise a denial of due process. *See Winnick,* 460 F.2d at 550 ("[W]e are not inclined to hold that every deviation from a university's regulations constitutes a deprivation of due process"); *see also Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 106, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (noting that Eleventh Amendment bars federal court from instructing state officials on how to conform their conduct to state law).

Paradoxically, Ms. Lark cites the 12–day delay between actual notice and the initial conference as a violation of CSC § V(C)(3), even as she criticizes Defendants for failing to provide her with a disciplinary hearing before a Judicial Board. Had SUNY Purchase provided a Judicial Board—something it could not organize until the fall term had begun—adjudication of Ms. Lark's status would have been delayed even further. She cannot have it both ways. Plainly, the extra five-day wait between Ms. Lark's notice and her initial conference did not prejudice her in any way, let alone rise to the level of a federal constitutional violation.

Ms. Lark's complaint about her inability to cross-examine Mr. Nicholson similarly rings hollow in light of Ms. Long Porter's sworn statement that she did not consider Mr. Nicholson's written submission—an assurance I see no reason to ignore. Even if Ms. Long Porter *had* reviewed Mr. Nicholson's statement in determining Ms. Lark's sanction, "[t]he right to cross-examine witnesses generally has not been considered an essential requirement of due process in school disciplinary proceedings." *Winnick,* 460 F.2d at 549.

#### (a) *Standard for Court Review of Administrative Record*

■ The parties dispute whether, in resolving the instant motion, this Court has authority to conduct a *de novo* review of the administrative record, or whether I must defer to the findings of fact made by Ms. Long Porter, the administrative hearing officer. I conclude, based on the Supreme Court's holding in *Hurley v. American Gay Group of Boston,* 515 U.S. 557, 567–68, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995), that, in reviewing Lark's claim that her activity was in the nature of protected speech, this Court has the authority and the "constitutional duty to conduct an independent examination of the record as a whole, without deference to the [fact finder]." *Id.*

In *Hurley,* the organizer of Boston's St. Patrick's Day Parade appealed to the United States Supreme Court from a Massachusetts Supreme Judicial Court ruling that the exclusion of an Irish group for gay, lesbian, and bisexual individuals from participation in the parade had violated state law prohibiting discrimination in public accommodations. *See id.* at 562–63, 115 S.Ct. 2338. Faced with petitioners' assertion that requiring them to admit a parade contingent expressing a message not of the private organizers' own choosing violates the First Amendment, the Court did not bind itself by the state courts' determination that the parade lacked constitutionally protected expressive content. *See id.* at

564–66, 115 S.Ct. 2338. Restating well-settled First Amendment doctrine, the *Hurley* Court observed:

> The requirement of independent appellate review … is a rule of federal constitutional law, which does not limit our deference to a trial court on matters of witness credibility, but which generally requires us to review the finding of facts by a State court … where a conclusion of law as to a Federal right and a finding of fact are so intermingled as to make it necessary, in order to pass upon the Federal question, to analyze the facts. This obligation rests upon us simply because the reaches of the First Amendment are ultimately defined by the facts it is held to embrace, and we must thus decide for ourselves whether a given course of conduct falls on the near or far side of the line of constitutional protection. Even where a speech case has originally been tried in a federal court, subject to the provision of Federal Rule of Civil Procedure 52(a) that "[f]indings of fact … shall not be set aside unless clearly erroneous," we are obliged to make a fresh examination of crucial facts. Hence, in this case, though we are confronted with the state courts' conclusion that the factual characteristics of petitioners' activity place it within the vast realm of nonexpressive conduct, our obligation is to make an independent examination of the whole record, … so as to assure ourselves that th[is] judgment does not constitute a forbidden intrusion on the field of free expression.

*Id.* at 567–68, 115 S.Ct. 2338 (citations and quotation marks omitted, modifications in original).

The *Hurley* Court's reasoning compels a similar conclusion when applied to the instant facts. Just as in *Hurley,* where the Court owed no particular deference to a state trial court's fact finding in a First Amendment case, this Court cannot be bound by the conclusions of Ms. Long Porter, a state administrative official.

This is especially clear on these facts because Ms. Long Porter's findings—whether Ms. Lark intimidated, detained, coerced, or harassed Ms. Walker—do not reach issues on which she has any inherent expertise. The Second Circuit, in *Bartlett v. New York State Bd. of Law Examiners,* recently reflected on the rationale for according deference to findings of fact by a state administrative agency: "when deference is due [to a state administrative agency] … it is not because of the factfinder's status as a state agency, but because of the factfinder's inherent expertise on technical matters foreign to the experience of most courts." *Bartlett v. New York State Board of Law Examiners,* 156 F.3d 321, 327 (2d Cir.1998) (quotation marks omitted). Surely a state university judicial officer has no greater expertise in finding intimidation or harassment than a United States District Judge. The *Bartlett* Court added that "deference is particularly 'inappropriate once that agency is the defendant' " in a suit challenging the basis for those findings, as in this case. *Id.* at 327 (quoting *New York State Assoc. for Retarded Children, Inc. v. Carey,* 612 F.2d 644, 649 (2d Cir.1979)).

Ms. Lark alleges that Defendants brought disciplinary proceedings and imposed a suspension upon her in retaliation for engaging in First Amendment expressive activities. I cannot properly evaluate whether Ms. Lark's constitutional rights have been violated—a question of law—without first examining whether Ms. Long Porter improperly concluded that Ms. Lark's alleged conduct had limited protected expressive qualities—a mixed question of fact and law. That is, resolving Lark's First Amendment claim intermingles conclusions of law and findings of fact such that it becomes necessary "in order to pass upon the Federal question, to analyze the facts." *Hurley,* 515 U.S. at 567, 115 S.Ct. 2338 (quoting *Fiske v. State of Kansas,* 274 U.S. 380, 385–86, 47 S.Ct. 655, 71 L.Ed. 1108 (1927)).

Defendants counter that Ms. Lark's failure to bring an Article 78 proceeding in New York State Supreme Court challenging the sufficiency and findings of her administrative hearing precludes her from litigating those issues as part of a § 1983 claim in federal court. *See* Defendants' Letter Brief, dated March 29, 1999, at 3 (citing *University of Tennessee v. Elliott,* 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986)). Defendants are mistaken. *Elliott* held that a state administrative law judge's finding that the University of Tennessee was not motivated by racial prejudice in seeking to discharge respondent had preclusive effect over respondent's § 1983 employment discrimination claim, but not over his Title VII claim. *See Elliott,* 478 U.S. at 799, 106 S.Ct. 3220. The *Elliott* Court justified its decision as consistent with the general goals of collateral estoppel: avoiding costly repetitive litigation and conserving judicial resources when the parties have had an adequate opportunity to litigate the issues. *Id.* at 798, 106 S.Ct. 3220. However, the *Elliott* Court did not suggest that its holding should apply to First Amendment claims, and I see no reason to infer such an intention in light of the *Hurley* Court's clear articulation, ten years later, of the federal court's duty to review the factual record in cases involving the First Amendment.

Defendants fail to cite a single case, and this Court is not aware of any, in which a court has found a prior administrative determination to have preclusive effect upon a First Amendment claim. *Cf. Colon v. Coughlin,* 58 F.3d 865, 870 (2d Cir.1995) (prior administrative proceeding and subsequent Article 78 challenge had no preclusive effect because prisoner first raised First Amendment retaliation claim in § 1983 action). The *Colon* Court pondered, in a footnote, the related question whether a prisoner plaintiff must raise his retaliation claim in state court before he may do so in federal court. *See id.,* 58 F.3d at 870, n. 3. The Second Circuit observed that "[t]he general rule is that 'exhaustion of state remedies "is not a prerequisite to an action under § 1983," even an action by a state prisoner.' " *Id.* (quoting *Heck v. Humphrey,* 512 U.S. 477, 480, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994)) (emphasis supplied by *Heck* Court). Explaining further that the Supreme Court, in *Heck,* had held that a § 1983 prisoner plaintiff seeking damages for "harm caused by actions whose unlawfulness would render a conviction or sentence invalid" must first overturn the conviction or sentence through state proceedings or a federal writ of habeas corpus, the Circuit speculated whether a prisoner's retaliation claim would be treated similarly. *Id.* (quoting *Heck,* 512 U.S. at 486–87, 114 S.Ct. 2364). The *Colon* Court did not ultimately resolve the question because it was neither discussed by the District Court nor addressed by the parties on appeal.

Obviously, Ms. Lark is not a prisoner, and her claim does not emanate from a criminal proceeding. Her retaliation claim falls squarely within the general rule revisited in *Heck* —that exhaustion of state remedies is *not* a prerequisite to her § 1983 claim—rather than outside it. Accordingly, I find that Ms. Lark's failure to challenge the sufficiency of her disciplinary proceeding in state court does not preclude her federal action. I find further that I am not bound by Ms. Long Porter's findings; instead, I have conducted a *de novo* review of the administrative record as it has been presented to this Court.

(b) *Findings of Fact Concerning Lark's Conduct*

■ Based on my review of the administrative record, I find it established by a preponderance of the credible evidence that Ms. Lark violated CSC § III(C)(3) by detaining Ms. Walker on campus against her will, in a way that endangered Ms. Walker's psychological health, following the group's return from the Massachusetts COC trip. Ms. Walker testified that she repeatedly told Ms. Lark that she wished to go home and that Ms. Lark deliberately

impeded Ms. Walker's plans to leave her company and the SUNY Purchase campus. *See, e.g.,* Hearing Transcript, at 6:

> so I told her I wanted to go home ... and she was telling me I can't even go home ... she was saying you know if I go home, I'm never going to be able to come back ... and I started to cry and I was like I just want to go home and kept repeating it, and then she shook [*sic*] my hand and I looked in her eyes and everything and she was like 'why don't we pray' ya know, and I turned my head away, I was like I don't want to pray, I just want to go home.

*Id.,* at 6.

Ms. Walker further testified that Ms. Lark, knowing Ms. Walker's car was unavailable, detained the complainant until after she had missed the bus that would take her from campus to her family. *See id.* at 5–6:

> when I did get back to campus on Saturday it was like 5 minutes to 6, so I told her I had to catch the 6 o'clock bus cause I'm going home, so she was like, so you don't want to go to church tomorrow I was like no I'm going home, I promised my father, so she was like okay, (inaudible) cause you're probably going to miss the bus anyway.... So I called to see if my car came in from the garage but it didn't and I called to see if my parents are home but they weren't home so I didn't have any other choice in getting home so I went downstairs to get a ride from [Lark]. When I went to her room, you know they were all in there waiting and I was looking at my watch and giving them a signal that you know I gotta go catch the bus, so [Lark] was like, okay D you gotta talk, so she told me to sit down in the room, and I sat down like across from her cause I didn't want to sit next to her...

*Id.,* at 5–6.

As Ms. Walker testified, she did not return home, but instead went back to her room, deeply depressed and contemplating suicide. *See id.,* at 6–7.

## (c) *Analysis of Long Porter's Administrative Findings*

I find no fault with Ms. Long Porter's finding that Ms. Lark violated CSC § III(C)(3) in that she behaved in a "manner which endanger[ed] the health or safety of' Ms. Walker." It does not matter that, as Plaintiffs note, Ms. Walker did not accuse Ms. Lark of *physically* detaining her. Coercion can be accomplished effectively through words and body language alone, particularly when the perpetrator knows that she wields an unreasonably persuasive influence over her subject, as was certainly the case between Ms. Lark and Ms. Walker. *See, e.g.,* Hearing Transcript, at 5 ("when I'm in front of her its [*sic*] like I can't say no. You know and she knew that about me too cause I told her I feel like I'm in front of the Heavenly Father..."). Accordingly, I uphold, as reasonable, Ms. Long Porter's finding that Ms. Lark violated CSC § III(C)(3) (Charge 2) when she "detained Ms. Walker from leaving the campus after [their] return from the Springfield trip." Exh. I to Long Porter aff.

Moreover, I conclude that the finding by Ms. Long Porter related to Ms. Lark's *conduct* and not her speech. Plaintiffs contend otherwise, alleging that SUNY Purchase punished Ms. Lark for free expression, but harassing and coercive behavior is not protected by the First Amendment just because it stems from discussion of religion or speech is used. Viewed as a whole, Ms. Lark's behavior during the bedroom incident crossed over from religious expression to infringement of another individual's rights.

Plaintiffs argue that Ms. Walker was an adult and capable of taking care of herself, in the face of Ms. Lark's insistent proselytizing. They further contend that Ms. Lark cannot be held responsible for Ms. Walker's irrational view of Ms. Lark as somehow akin to God—which, in Ms. Long Porter's view, rendered the complainant

unusually susceptible to intimidation and coercion. However, Plaintiffs cite no authority for the proposition that the "intimidating" or "coercive" nature of Ms. Lark's activity must be judged against a "reasonable person" standard, rather than against the psychological state of her chosen target. I conclude that Ms. Long Porter was free to take Ms. Walker's apparent psychological weaknesses into account in determining whether she was, in fact, intimidated or coerced.

As to the other two violations, I find insufficient support in the administrative record to conclude that Ms. Lark violated CSC §§ III(C)(2) or (C)(4). Section III(C)(2) punishes a person who "threatens, harasses, stalks, or intimidates any person," and sub-section (a) adds "uses words which reasonably tend to incite immediate, violent reaction and are specifically directed toward another individual." Exh. A to Long Porter aff., at 100. Ms. Long Porter found a violation in that "Ms. Walker was intimidated by [Ms. Lark]." Exh. I to Long Porter aff. I do not dispute Ms. Long Porter's conclusion that Ms. Walker was intimidated, or that Ms. Lark was responsible, but this is plainly insufficient to constitute a violation under the applicable CSC section. There is no indication in the record that Ms. Lark "use[d] words which reasonably tend to incite immediate, violent reaction" and, in light of this deficiency alone, Ms. Long Porter's conclusion was unwarranted.

I take issue, as well, with Ms. Long Porter's conclusion that Ms. Lark violated CSC III(C)(4)(f), which punishes "practices in connection with initiation into or affiliation with any group ... which forces or requires conduct that would embarrass or negatively affect the dignity of the individual, or the creation of situations which cause psychological or undue emotional strain." Although one might reasonably conclude from this record that Ms. Lark wished to "initiate" Ms. Walker into the COC, and also that the interactions between the two caused psychologi-

cal and emotional strain to Ms. Walker, there is nothing to link one with the other. That is, Ms. Long Porter cites Ms. Lark's general conduct as the cause of psychological strain, and Ms. Lark's repeated requests that Ms. Walker publicly confess her sins as the cause of emotional strain, but does not suggest what the two have to do with "initiation" or "affiliation." If these generalized assertions provided sufficient grounds for a violation, then CSC § III(C)(4)(f) would be reduced to an impermissibly vague catch-all regulation, rather than the specific, anti-hazing requirement that it appears to be. Moreover, as Plaintiffs argue, encouraging another to confess her sins, however forcefully, is an essential exercise of religious expression for many faiths and cannot provide the grounds for a defensible sanction here.

█ Notwithstanding my conclusion that the evidence establishes only one violation of the CSC, I conclude that the sanction Ms. Long Porter imposed was not unreasonable in these circumstances. Violation of CSC § III(C)(3) carries a minimum sanction of "Reprimand" and a maximum of "Expulsion." As Ms. Long Porter noted, Ms. Lark had taken advantage of Ms. Walker's vulnerability and susceptibility to influence, and Ms. Lark expressed no remorse for any damage she may have caused. In light of these factors, a two semester suspension does not strike this Court as disproportionate to the violation.

I turn next to Plaintiffs' claim that Defendants disciplined Ms. Lark for engaging in protected expressive activity, rather than for violating SUNY Purchase policies.

### 2. First Amendment Retaliation

Plaintiffs allege that Defendants violated Ms. Lark's First Amendment rights by suspending her with the content-based intent to suppress her speech and religious expression. Defendants predictably disagree, countering that Ms. Lark was disciplined for engaging in conduct that, albeit

containing expressive elements, violated SUNY Purchase policies.

■ It is well-settled that "conduct by a student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 513, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). "The distinction between regulating speech and regulating conduct that has expressive components is fundamental." *United States v. Weslin*, 156 F.3d 292, 297 (2d Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 804, 142 L.Ed.2d 665 (1999). The Supreme Court has held that while conduct can have protected expressive components, *see, e.g., United States v. O'Brien*, 391 U.S. 367, 376–77, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), "conduct designed not to communicate but to coerce merits . . . less consideration under the First Amendment." *International Longshoremen's Ass'n v. Allied Int'l, Inc.*, 456 U.S. 212, 226, 102 S.Ct. 1656, 72 L.Ed.2d 21 (1982).

■ Ms. Lark was suspended after a fair disciplinary hearing, which I have already concluded did not violate her constitutional right to due process. I am persuaded that Defendants had reason to commence that disciplinary proceeding other than to silence Ms. Lark's religious expression. The question that remains is whether, in disciplining Ms. Lark, SUNY Purchase impermissibly burdened her speech or expressive conduct. *See Weslin*, 156 F.3d at 297.

The Second Circuit recently restated, in *Weslin*, the criteria for determining the "constitutionality of laws that burden expression while restricting proscribable conduct." *Id.* The three-prong test, established by the Supreme Court in *O'Brien*, requires the following:

(i) the regulation must serve an important or substantial governmental interest; (ii) the interest must be unrelated to the suppression of expression; (iii) the incidental restriction of First Amendment freedoms must be narrowly tailored to that interest

*Weslin*, 156 F.3d at 297 (citing *O'Brien*, 391 U.S. at 377, 88 S.Ct. 1673).

I find for the purposes of this preliminary injunction motion that Ms. Lark is not likely to prevail on the merits of her claim that her suspension effected an unconstitutional restriction of her First Amendment rights. Defendants acted in furtherance of an important governmental interest, namely, protecting the psychological well being of SUNY Purchase students and preserving the learning environment on campus. *See* Herron aff., ¶ 30. SUNY Purchase can enforce its disciplinary rules to ensure that its students can learn without being intimidated, harassed, coerced, or detained. As I have discussed above, I reject Plaintiffs' assertion that bias and hostility to Ms. Lark's religious views tainted her disciplinary proceedings; instead, I find it more likely on this record that Defendants' governmental interest was unrelated to expression. SUNY Purchase's interest is compatible with robust, persuasive expression, provided it is coupled with respect for the diversity of views, religious and otherwise, among the members of its academic community.

Finally, with respect to *O'Brien's* third prong, I find that the suspension was narrowly tailored to further SUNY Purchase's governmental interest, notwithstanding the incidental restriction of Ms. Lark's First Amendment freedoms. The Second Circuit held, in *Rosenfeld v. Ketter*, that officials at the State University of New York at Buffalo did not violate a law student's First Amendment rights when they prohibited him from entering the campus for the duration of a semester-long disciplinary suspension. *Rosenfeld v. Ketter*, 820 F.2d 38, 41 (2d Cir.1987). The plaintiff, who had been suspended as a result of his

participation in a campus protest, argued, like Ms. Lark, that the suspension order's terms impermissibly restricted his rights because they deprived him of the opportunity to participate in cultural and political activities on campus that are otherwise open to students and to the general public. *See id.* at 40–41. The Second Circuit rejected this claim as "entirely without merit," noting that "[t]he suspension order did not prevent Rosenfeld from participating in any political activity, speaking on any subject or assembling with any group. The order merely barred him from doing those things, or anything at all, *at the University.*" *Id.* at 40 (emphasis added).

Ms. Lark's position is indistinguishable from Rosenfeld's and similarly without merit. Ms. Lark has not shown, on this record, that the *persona non grata* designation was not reasonably related to SUNY Purchase's interest in punishing her and preventing further violation of College policies against intimidation. Accordingly, the incidental burden on her speech is permissible. *See id.* at 41 (citing *United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)). It is of no moment that Ms. Lark would prefer to exercise her First Amendment rights in the company of others on the SUNY Purchase campus. The Second Circuit's observation in *Rosenfeld* is equally applicable here: "[g]iven the virtually unlimited opportunities for free expression that remain[ ] available to [Ms. Lark], [s]he simply has not stated a valid claim under the first amendment." *Id.*

I am unpersuaded by Plaintiffs' argument that Ms. Lark's punishment violates her First Amendment rights because it is disproportionate to her offenses. Defendants imposed a punishment that was neither the minimum nor the maximum available for the rule I have concluded she violated. While it is true that, as Ms.

Lark alleges, her two-semester suspension and the concomitant imposition of *persona non grata* status for that period will prevent her from using SUNY Purchase facilities to worship or express her views, it leaves her free to do so anywhere else. Plaintiffs offer no authority to show that CSC § IV(C)(2), authorizing the assignment of *persona non grata* status to suspended students during their suspension, is constitutionally infirm, and no such conclusion is justified here. Otherwise, neither SUNY Purchase, nor any state university, would never be able to designate anyone *persona non grata,* because doing so would necessarily infringe upon the individual's constitutional right to exercise free speech in the public spaces on campus. *Cf. Widmar v. Vincent,* 454 U.S. 263, 277, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (affirming "the continuing validity of cases . . . that recognize a University's right to exclude even First Amendment activities that violate reasonable campus rules or substantially interfere with the opportunity of other students to obtain an education").

### 3. *New York State Constitutional Claims*

I note at the outset that Plaintiffs' briefing on this issue, in contrast to the rest of their papers, is wholly inadequate. In the sixty-one pages of their initial motion and reply memoranda, Plaintiffs devote scarcely two sentences to Ms. Lark's state claims, one sentence of which is merely an extended string cite consisting of quotations from Article I, sections 3, 8, and 11 of the New York State Constitution, and one case citation.[14] That one case, *O'Neill v. Oakgrove Constr., Inc.,* purportedly establishes Ms. Lark's free speech claim under the New York State Constitution. *O'Neill v. Oakgrove Construction,* 71 N.Y.2d 521, 528 N.Y.S.2d 1, 523 N.E.2d 277 (1988). The New York Court of Appeals, in *O'Neill,* noted that the "protection afford-

---

**14.** Of course, this minimalist treatment appears positively exhaustive in light of Plaintiffs' failure even to mention the COC's state constitutional claims. I take this lacuna to indicate that the COC does not base its motion for injunctive relief on its pendent state claims.

ed by the guarantees of free press and speech in the New York Constitution is often broader than the minimum required by the First Amendment." *Id.*, 71 N.Y.2d at 529 n. 3, 528 N.Y.S.2d at 4, n. 3, 523 N.E.2d 277.

The *O'Neill* Court's lofty but ambiguous pronouncement, though undoubtedly comforting to civil libertarians in the Empire State, does little to demonstrate that Ms. Lark is entitled to preliminary injunctive relief on the instant facts. While New York courts may impose a stricter barrier to government restrictions aimed at a particular message, that is not the appropriate standard here, where I have concluded that SUNY Purchase punished Ms. Lark's conduct irrespective of her expression. The applicable New York test for content-neutral government regulations that burden speech only incidentally was established by the New York Court of Appeals in *People ex rel. Arcara v. Cloud Books:*

> when government regulation designed to carry out a legitimate and important State objective would incidentally burden free expression, the government's action cannot be sustained unless the State can prove that it is no broader than needed to achieve its purpose.

*Id.*, 68 N.Y.2d 553, 510 N.Y.S.2d 844, 503 N.E.2d 492 (1986).

The *Arcara* test is scarcely different from *O'Brien*'s, except perhaps that it imposes a greater burden on SUNY Purchase to prove that Ms. Lark's suspension was no broader than was needed to achieve its legitimate governmental purpose of protecting the psychological well being of its students and preserving the learning environment on campus. I have already concluded that Ms. Lark's sanction was reasonably proportional to her violation. I find it likely that SUNY Purchase will demonstrate at trial that less restrictive alternatives, *i.e.*, anything short of suspension, would not serve the College's objective of curtailing Ms. Lark's coercive conduct. Accordingly, Plaintiffs are unlikely to prevail on their claim that the

incidental burden on Ms. Lark's speech was impermissible.

As for their remaining state constitutional claims, Plaintiffs offer no case, state or federal, to support Ms. Lark's claim that Defendants have violated her rights to equal protection and the free exercise of religion under the New York State Constitution. Nor do they provide any legal analysis whatsoever to support their contention that she is likely to prevail on the merits, simply resting their argument on quotations from the relevant constitutional sections. There is reason to believe that no cause of action exists under the state constitution itself, at least with respect to Ms. Lark's equal protection claim under Art. I, § 11. *See, e.g., Kalsi v. New York City Transit Authority*, No. 94–CV–5757 (JG), 1998 WL 903469, at * 16 (E.D.N.Y. Dec.22, 1998) ("The New York Court of Appeals has stated that Article I, § 11 ... 'was not intended to create a duty without enabling legislation but only to state a general principle'") (quoting *Brown v. State*, 89 N.Y.2d 172, 652 N.Y.S.2d 223, 674 N.E.2d 1129 (1996)). As to Ms. Lark's free exercise claim, under Article I, § 3, I have already found that Defendants have not infringed upon her right to engage in religious activities; they have merely barred her from doing so in one particular location, the SUNY Purchase campus. *See* analysis at section II(A)(1)(b), *supra.* To state the obvious, Plaintiffs have not carried their burden, on this motion for preliminary injunctive relief, to demonstrate Ms. Lark's likelihood to prevail on the merits of her state claims.

Defendants' opposition papers vie with Plaintiffs' motion in terms of inadequacy. Defendants contend in a footnote that Plaintiffs' motion with respect to Ms. Lark cannot succeed on the basis of her state constitutional claims because, if Ms. Lark's federal claims prove to be without merit, then this Court has no jurisdiction over the state law claims. *See* Defs.' Br. at 21 n. 26 (citing 28 U.S.C. § 1367(c); *Irish Lesbian and Gay Organization v. Bratton*, 882

F.Supp. 315, 321 (S.D.N.Y.1995)). Defendants' argument misconstrues the reach of pendent jurisdiction. Under § 1367, this Court has discretion whether to exercise jurisdiction over Plaintiffs' pendent state law claims, but only after having *dismissed* the federal claims, over which the Court has original jurisdiction. As this is a motion for preliminary injunction, I have merely concluded that Ms. Lark is unlikely to prevail on the merits of her federal claims. There is no motion to dismiss *sub judice* and I am not granting summary judgment *sua sponte.* Accordingly, I do not now have discretion to decline jurisdiction over the concomitant state claims.

I do find, however, for the reasons discussed above that Plaintiffs have not come close, on the basis of this record, to demonstrating a likelihood of success on the merits of Ms. Lark's state constitutional claims.

### B. *Lark: Irreparable Harm*

Having concluded that Ms. Lark is not likely to succeed on the merits of her claims at trial, I need not consider whether she will suffer irreparable harm without injunctive relief. Nonetheless, were I required to make such a determination, I would find that she has not. Unlike the COC, Ms. Lark has not made sufficient allegations of a direct governmental suppression of her speech to come within the *per se* irreparable injury rule articulated in *Jolly v. Coughlin. See id.,* 76 F.3d at 482; see also discussion at section II(D), *infra.* Rather, as explored more fully above, this record shows that SUNY Purchase imposed a permissible, incidental burden on Ms. Lark's speech in furtherance of a governmental interest unrelated to expression.

Plaintiffs assert, in the alternative, that the denial of the right to pursue an education constitutes irreparable harm, but they cite no binding authority to support this contention. In *Phillips v. Marsh,* the only Second Circuit case offered by Plaintiffs on this issue, an army cadet, expelled by West Point during her final semester, sought a preliminary injunction in this District ordering her reinstatement to the United States Military Academy pending the outcome of her suit. *Phillips v. Marsh,* 687 F.2d 620, 621 (2d Cir.1982). District Judge Ward ordered the plaintiff's reinstatement and defendants appealed. By the time the Court of Appeals had prepared its opinion for release, the plaintiff's final semester had ended and the panel recognized that it could no longer properly review the District Court's order with respect to reinstating the plaintiff. Instead, the Court of Appeals reversed the grant of preliminary injunction insofar as it required the Academy to graduate and commission the plaintiff (an issue not relevant here), and specifically noted the limits of its holding: "We express no view with respect to the remainder of the preliminary injunction [pertaining to plaintiff's reinstatement], which is now unreviewable because of mootness." *Id.* at 622.

Contrary to Plaintiffs' characterization, the law is not "well-settled" that denial of the right to pursue an education at a particular institution constitutes irreparable harm. *See* Pls.' Br. at 50; Reply Memorandum of Law in Support of Plaintiffs' Motion For a Preliminary Injunction at 9. The *Phillips* panel merely observed, in *dicta,* that the District Judge's ruling *may* have been correct: "It may well have been true, as Judge Ward concluded, that interruption of Phillips's academic work would have created irreparable harm, because '(t)he loss of time, military seniority, education and status involved in a dismissal from the Academy cannot be adequately compensated at law.'" *Phillips,* 687 F.2d at 622 (citation omitted). Plaintiffs do not offer—and this Court is not aware of—any other Second Circuit case on point. I am not prepared to find *per se* irreparable harm in the instant case based on passing speculations by the *Phillips* panel in a matter where the stakes went far beyond graduating from college on time.

In each of Plaintiffs' other two cases on this issue, the District Court found the

irreparable harm requirement satisfied by a cadet challenging *expulsion* from a military academy just prior to graduation. *See, e.g., Tully v. Orr,* 608 F.Supp. 1222 (E.D.N.Y.1985); *McLaughlin v. Massachusetts Maritime Academy,* 564 F.Supp. 809 (D.Mass.1983). If there is any rule to be derived from these military expulsion decisions, it is not one that lends itself to the instant facts. Barring Ms. Lark from taking her customary one class at SUNY Purchase for one semester (while she still lacks one-third of the credits needed to graduate) [15] can scarcely be equated with cases in which cadets in their final semester, awaiting graduation and their military commissions, face outright dismissal—not a suspension for a period of months.

Finally, I note, in passing, that Ms. Lark's own delay in commencing this action for four months, until after she had already served half of her suspension, weakens her claim that she will suffer irreparable harm without immediate preliminary injunctive relief. This Court has previously observed that a four-month delay in bringing a motion for injunctive relief can be seen as "tantamount to laches and grounds for denial of the relief sought." *Birnbaum v. Blum,* 546 F.Supp. 1363, 1367–68 (S.D.N.Y.1982).

## C. *COC: Likelihood of Success on the Merits*

■ Defendants' conduct toward the COC is more troubling constitutionally. It appears from this record that, after repeatedly renting the PAC to the COC and a wide array of other non-student users, SUNY Purchase revoked the COC's permit because of the group's religious activities. This constituted an exercise in content-based discrimination with respect to a designated public forum, which is unconstitutional unless narrowly drawn to further a compelling governmental interest. *See New York Magazine v. Metropolitan Transp. Auth.,* 136 F.3d 123, 128 (2d Cir.)

(citing cases), *cert. denied,* —— U.S. ——, 119 S.Ct. 68, 142 L.Ed.2d 53 (1998).

The Supreme Court has identified three types of fora in the analysis of First Amendment restrictions on government property: the traditional public forum; the designated forum; and the nonpublic forum. *See New York Magazine,* 136 F.3d at 128. In traditional public fora, which include public streets, parks, and places that "by long tradition ... have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed." *Perry Educ. Ass'n v. Perry Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). The State cannot enforce a content-based exclusion in these locations without showing that its regulation is necessary to serve a compelling state interest and that the regulation is narrowly drawn to achieve that end. *Id.; see also New York Magazine,* 136 F.3d at 128. "The state may also enforce regulations of the time, place, and manner of expression that are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry,* 460 U.S. at 45, 103 S.Ct. 948.

In the second category of public property, the designated public forum, the government opens a place for use by the public for expressive activity. *See Perry,* 460 U.S. at 45, 103 S.Ct. 948; *see also New York Magazine,* 136 F.3d at 128. The Courts apply the same heightened scrutiny to restrictions of speech in designated public fora as they do for traditional public fora. *See New York Magazine,* 136 F.3d at 128. "The Constitution forbids a state to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place. Although a state is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum." *Perry,* 460

---

**15.** *See* Herron aff., at 11 & n. 3.

U.S. at 45, 103 S.Ct. 948 (citations omitted).

All remaining government property falls in the third, non-public forum category. Here, the government may limit speech if "the limitation is reasonable, and not based on the speaker's viewpoint." *New York Magazine*, 136 F.3d at 128 (citing *Perry*, 460 U.S. at 46, 103 S.Ct. 948).

Plaintiffs contend that, as a result of SUNY Purchase's leasing practices, the PAC is a traditional public forum, though it appears from their papers that they mean a *designated* public forum. *See* Pls.' Br., at 45–47 (citing *Widmar*, 454 U.S. at 267–77, 102 S.Ct. 269). Plaintiffs invoke Widmar for its holding that a university had created a public forum by making its facilities generally available to registered student groups. *Id.* at 46, 103 S.Ct. 948 (citing *Widmar*, 454 U.S. at 267, 102 S.Ct. 269). While the *Widmar* Court did not employ the phrase "designated public forum," it acknowledged a conceptual distinction between traditional, time-honored public fora and a facility made "public" by university practice, even if First Amendment expression in both sites merited equally stringent protection. *See Widmar*, 454 U.S. at 267–68 & n. 5, 102 S.Ct. 269 (noting that "[a] university differs in significant respects from public forums such as streets or parks or even municipal theaters.").[16]

In the end, the debate is purely semantic because Defendants' actions are subject to the same level of scrutiny whether the PAC is a traditional public forum or a designated public forum.

Defendants' contention that the PAC is a non-public forum scarcely passes the straight-face test. They begin innocently enough by pointing out correctly that the government does not create a public forum "by inaction," *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), and that the Court must look to governmental intent to determine whether a public forum has been created. *See New York Magazine*, 136 F.3d at 129. The Second Circuit, in *New York Magazine*, recently articulated some parameters for this inherently fact-based inquiry. *See id.* In evaluating governmental intent with respect to non-traditional fora, the Court looks at the nature of the property and its compatibility with expressive activity, as well as the nature of the restraints imposed on speech or expression. *See id.* (citing *Cornelius*, 473 U.S. at 802–04, 105 S.Ct. 3439). The Circuit pointedly contrasted cases where the government has exercised its "proprietary capacity" in opening the property for speech in order to raise revenue or facilitate its own internal business, prompting the Supreme Court to consider the forum non-public, with those in which the government makes its facilities available for the purpose of benefitting the public, in which case the Court found a public forum. *See id.* (citing cases); *compare Lehman v. City of Shaker Heights*, 418 U.S. 298, 303, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (no public forum where city engaged in commerce); *International Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (no heightened review where government acts as "proprietor, managing its internal operations"); *Perry*, 460 U.S. at 47, 103 S.Ct. 948 (state university mail facilities were not designated public forum where the " 'normal and intended function ... is

---

**16.** A year later, in *Perry*, the Supreme Court articulated a "second category" of government property which, once made available to the public for expressive activity, receives the same constitutional scrutiny as applies in the first category, traditional public fora. *See Perry*, 460 U.S. 37, 45–46, 103 S.Ct. 948, 74 L.Ed.2d 794. The *Perry* Court cited *Widmar* as a recent example of how a "public forum may be created for a limited purpose" and then turned from the two highly protected categories to discuss the more minimal protections available on the remaining category of public property "which is not by tradition or *designation* a forum for public communication...." *Perry*, 460 U.S. at 46 & n. 7, 103 S.Ct. 948 (emphasis added).

to facilitate internal communication'" — not to serve the public) *with Widmar*, 454 U.S. at 267–69, 102 S.Ct. 269 (finding public forum where state university made its meeting facilities available to registered student groups); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (finding designated public forum where city leased theater dedicated to expressive activities).

Here, Defendants' argument runs into trouble. Faced with Plaintiffs' evidence that SUNY Purchase rented the PAC to a wide range of public and private groups unaffiliated with the university, for myriad expressive purposes, some related to the academy and some not, Defendants repeatedly offered "public service" as SUNY Purchase's justification for leasing the PAC to certain groups. But "public service" excludes no one. Defendants are correct when they observe that "[t]he PAC will not be deemed to be a public forum unless it has been opened 'by policy or by practice ... for indiscriminate use by the general public ... or by some segment of the public ...'."[17] But that is precisely what Defendants here have done—they opened the PAC for indiscriminate use. Accordingly, Defendants' attempts to maneuver the PAC into the non-public category are unavailing.

Alternatively, Defendants suggest that the PAC is a "limited public forum," a subcategory that the Second Circuit has identified within the designated public forum category. In the limited public forum, "government 'opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects.' Exclusions of speech under this category are treated the same as exclusions under non-public fora:" *i.e.*, the restriction need only be reasonable and viewpoint-neutral. *New York Magazine*, 136 F.3d at 128 n. 2 (quoting *Travis v. Owego–Apalachin Sch. Dist.*, 927 F.2d

688, 692 (2d Cir.1991)) (citations omitted). Defendants argue that the PAC is, at most, a limited public forum because SUNY Purchase policy limited access to the facility to organizations and groups whose intended use of the space "is consistent with or in furtherance of the University purposes." Beach aff., ¶ 3.

Once again, Defendants' own actions give the lie to that claim. As discussed above, SUNY Purchase opened the PAC to a wide array of student and non-student entities, including non-profit groups, corporations, and entertainers for concerts, conferences, shareholder meetings, trade shows, films, recordings, plays, and other events. In view of the breadth of that list, Defendants are hard-pressed to argue that they have ever limited use of the PAC to "certain kinds of speakers or to the discussion of certain topics" as required in a "limited" public forum. In fact, Defendants have not demonstrated to this Court that they have ever refused to rent the PAC to *any* group that could afford to pay for the facilities at a time when they were available.

Perhaps most damning to Defendants' claim of limited, university-related use is the rental that gave rise to this suit. SUNY Purchase, a taxpayer-financed public university, licensed its facilities to the COC, a private church congregation, for the better part of two years, so the COC could conduct worship for a congregation consisting almost exclusively of persons who were not affiliated with the school. Indeed, if the College is to be believed, it leased the PAC with the express proviso that the university community not be asked to participate in COC-sponsored worship. How that qualifies as a "University purpose" is a mystery. Obviously, if the College rents to the COC, it will rent to anyone. SUNY Purchase has created in the PAC, through its own practice of accommodating so many diverse groups, a forum generally open for use by all groups.

---

17. Defs.' Br. at 29 (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988)) (modifications in original).

See *Widmar*, 454 U.S. at 267, 102 S.Ct. 269.

Defendants, like Rosencrantz and Guildenstern, are hoist by their own petard. If they wish the PAC to be treated at law as a non-public forum, then they must themselves treat the PAC as a non-public forum and substantially limit its access. They have yet to do so.

Having concluded that the PAC is a designated public forum, where restrictions on expressive activities must survive heightened scrutiny, I now turn to Defendants' justification for revoking the COC's license. Defendants assert that SUNY Purchase revoked the PAC license in response to reports by students of "persistent solicitation activities by members of the COC on campus", including "requiring participation in activities, interfering with private electronic communications, attempting to prevent students from having contact with their families, and using fear to gain compliance ..." Defs.' Br. at 32–33.

It is quite clear from this record that SUNY Purchase used its concerns about the practices of individual members, such as Ms. Lark and Mr. Dundie, as justification to take action against their church.[18] Defendants have not demonstrated why the revocation of the COC's license was necessary to advance the state interest of ensuring the psychological safety of SUNY Purchase students and protecting the learning environment on campus—or, for that matter, how the solution was narrowly tailored to achieve those ends. If individual members of the COC behave in inappropriate ways, as Lark did, they can be disciplined if they are students, or barred from campus if they are not. Banning the entire COC congregation, however, goes far beyond what is needed to protect SUNY Purchase students from intimidation and harassment. Defendants' efforts to protect its students against "persistent solicitation" that does not rise to the level of harassment or intimidation are constitutionally impermissible. This is viewpoint discrimination in its most blatant form and it is indefensible.[19]

### D. COC: Irreparable Harm

 Of course, Plaintiffs must show both likelihood of success on the merits and irreparable harm to prevail on a motion for preliminary injunctive relief. In order to establish irreparable harm, Plaintiffs must demonstrate "an injury that is neither remote nor speculative, but actual and imminent." *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir.1989). Additionally, the injury "must be one not capable of being fully remedied by money damages." *NAACP v. Town of East Haven*, 70 F.3d 219, 224 (2d Cir.1995) (citing *Tucker*, 888 F.2d at 975). The threat of irreparable harm is a *sine qua non* for granting preliminary injunctive relief. *See Buffalo Forge Co. v. Ampco–Pittsburgh Corp.*, 638 F.2d 568, 569 (2d Cir.1981). "[I]f there is no irreparable injury, there can be no preliminary injunction." *Markowitz Jewelry Co. v. Chapal/Zenray, Inc.*, 988 F.Supp. 404, 406 (S.D.N.Y.1997).

 Plaintiffs contend that the state's apparent deprivation of the COC's constitutional rights is *per se* irreparable injury. In this instance, Plaintiffs are correct. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373,

---

18. Mr. Dundie has also been charged with violating SUNY Purchase's Community Standards of Conduct. His disciplinary hearing has been held in abeyance pending the decision on this motion.

19. Because I have already concluded that the COC is likely to prevail on its claim that SUNY Purchase engaged in content-based discrimination in revoking the PAC license, I need not reach, for purposes of this motion, Plaintiffs' allegation that revocation of the license constituted an unlawful act of *First Amendment* retaliation.

96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality). As this Circuit has repeatedly held, the *"alleged* violation of a constitutional right ... triggers a finding of irreparable harm." *Jolly v. Coughlin, supra,* 76 F.3d at 482 (8th Amendment; prisoner physically confined in medical keeplock for three-and-a-half years for refusing to consent to TB test) (citing *Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992) (4th and 14th Amendment; prison inmates challenging visual body cavity searches)); *Mitchell v. Cuomo,* 748 F.2d 804, 806 (2d Cir.1984) (8th Amendment; preventing New York from closing a prison when state system was already overcrowded).

This Court notes that the Third Circuit Court of Appeals and several District Courts in this Circuit have challenged *Jolly's* ruling where the movant had not demonstrated a "direct penalization, as opposed to incidental inhibition of, First Amendment rights," or where the alleged violation was compensable through money damages. *Association of Legal Aid Attorneys v. City of New York,* 96 Civ. 8137(SHS), 1997 WL 620831, at *5 (S.D.N.Y. Oct. 8, 1997)(plaintiffs asserting prospective First Amendment violation offered no evidence that their employer would retaliate against them if they exercised free speech) (quoting *Hohe v. Casey,* 868 F.2d 69, 72–73 (3d Cir.), *cert. denied,* 493 U.S. 848, 110 S.Ct. 144, 107 L.Ed.2d 102 (1989)). *See also Hohe, supra,* (rejecting non-union state employees' challenge to "share fee" collection provision as depriving them of funds they might otherwise use for expressive purposes; "plaintiffs must show a chilling effect on free expression" to satisfy irreparable harm requirement) (quoting *Dombrowski v. Pfister,* 380 U.S. 479, 487, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965)); *Alvarez v. City of New York,* 2 F.Supp.2d 509, 514 (S.D.N.Y.1998) (mere initiation of internal investigation did not chill employee's speech sufficiently for irreparable harm); *Pinckney v. Board of Educ. of the Westbury Union Free School Dist.,* 920 F.Supp. 393, 400–401 (S.D.N.Y.1996) (school superintendent's claimed unlawful termination would be wholly compensable in money damages). However, these exceptions do not apply here. Unlike the movants in these other cases, Plaintiffs have demonstrated that, without injunctive relief, the COC will suffer a direct, chilling effect on expressive religious activities. The COC congregation will be collectively barred from gathering for worship in a public forum for no apparent reason other than SUNY Purchase's displeasure with the recruitment activities of individual members. Even if the COC subsequently prevails at trial, as I believe is likely, it cannot be compensated through money damages for the First Amendment violation it will have incurred. Plaintiffs have adequately demonstrated an alleged violation of the COC's First Amendment rights to satisfy the irreparable harm requirement.

III. *Conclusion*

Plaintiffs' motion for a preliminary injunction is denied with respect to Ms. Lark. However, Plaintiffs' motion is granted with respect to the COC. Plaintiffs are directed to submit an appropriate order for the Court's consideration.